21162

TOTAL SAFETY SERVICES, INC.
218 MAGNOLIA STREET
LONG BEACH, MISSISSIPPI 39560

COPY

ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT

# RICHARD PADGETT
# VS.
# FIELDWOOD ENERGY LLC., ET AL

**DATE**
**December 16, 2019**

**CIVIL ACTION:**
**6:18-CV-00632**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**
**JUDGE DOUGHTY**
**MAGISTRATE. JUDGE WHITEHURST**

**Prepared for**

**MR. EDWARD TAULBEE & MR. CHRISTOPHER TAULBEE**
**TAULBEE LAW FIRM, LLC**
**1023 E. ST. MARY BLVD.**
**LAFAYETTE, LOUISIANA 70503**

TELEPHONE NO.:(504) 415-0945
111TOTAL@GMAIL.COM

PLAINTIFF'S EXHIBIT 14

# INTRODUCTION

This ROOT CAUSE ANALYSIS report investigates the accident that occurred on the West Delta 70D, a production platform, owned by Fieldwood Energy, LLC, on or about October 10, 2017, at or about 2:30 pm., and outlines the findings from that investigation.

# QUALIFICATIONS

***Please see my Curriculum Vitae for a further explanion of my qualifications as a Safety Professional.***

**QUALIFICATIONS:** A safety professional, in any given industry, is required to have a working knowledge of the various operations his company performs in that industry, as well as a working knowledge of the applicable governing regulations. I have over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. While working in these industries, I have developed expertise relating to safety issues on production platforms, barges (pipe laying, dredging, drilling, jack ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels / boats (ship, MODU, tug, tow, supply, crew, etc.), and commercial and industrial buildings and building projects.

This on-the-job work experience began in the mid sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River, worked in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Heavy Equipment, and Crane Operator. Further safety experience and expertise was derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for included, New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine and Manufacturing. My safety consulting experience was gained by providing safety consultant services at the following: Gulf South Laboratories, Engineering Inspection and Investigation, Inc., Inspection Consultants, Inc., Ray Gibbins Industries, Allied Wireline, Western Wireline, Popich Brothers, Space, L&L Construction, Kaough & Jones, Kranco, Garza Welding, T & A Wireline, TCB Industries, Rembco, Foley Construction, Delta Coatings, Delta Temp, Inc., Cortex, Southern Environmental Control, Eagle Marine, American Marine, Mosby Enterprises, Total Marine Services, Vela Garage, Doomlar, Energy Drilling, Grady Crawford, Guilliot Construction, J & J Electric, Taylormade Enterprises, U. S. Abatement, Vogt Construction, Wescorp Construction, and Blake Drilling,

The companies I was employed by or contracted with followed the Federal regulations listed below, and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***

**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**
(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

# METHODOLOGY – ROOT CAUSE ANALYSIS

The evaluation tool I use to investigate and analyze an accident is based on widely recognized and accepted accident investigation analysis principles and methods employed in the safety profession: the **ROOT CAUSE ANALYSIS (RCA).**

My **ROOT CAUSE ANALYSIS (EVENTS AND CAUSAL FACTOR ANALYSIS)** is used to investigate this accident and my report is a structured step by step technique and procedure for ascertaining and analyzing the causes of accidents. The PROBLEMS AND DEFICIENCIES listed below in my report are examples of the major accident catagories that should have been included when the crew completes a **(JSA)** and would be included in a ROOT CAUSE ANALYSIS investigation:

**EXEMPLARY MAJOR ACCIDENT CATEGORIES**
**EQUIPMENT / MATERIAL PROBLEMS,**
**PROCEDURE PROBLEMS,**
**DESIGN PROBLEMS,**
**TRAINING DEFICIENCIES,**
**MANAGEMENT PROBLEMS.**

Examples of the accident subcatagories listed in my report address the specific accident PROBLEMS AND DEFICIENCIES related to the accident:

**EXEMPLARY SUBCATEGORIES**
**DEFECTIVE TOOLS / EQUIPMENT,**
**PRE-EMPLOYMENT EMPLOYEE EVALUATION,**
**PRE-JOB / EMPLOYEE EVALUATION (JSA),**
**PERSONAL PROTECTIVE EQUIPMENT,**
**TRAINING / CERTIFICATION / LICENCES,**
**FEDERAL AND /OR STATE STANDARDS / INDUSTRY STANDARDS,**
**INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

# ROOT CAUSE ANALYSIS

## I DATA COLLECTION

The following documents were reviewed in preparation for this preliminary root cause analysis report:

**Deposition Testimony:**

- Mr. John Davidson
- Mr. Blaine Marcantel
- Mr. Bryan Molaison
- Mr. Gregory Soileau
- Mr. Jason Simmons
- Mr. Richard Padgett
- Mr. Randall Mitchell

- Mr. Chris Randell
- Mr. Jason Pierre
- Mr. Khamla Vilayphanh
- Mr. Rodney Frederick
- Mr. Michael Stephens

**Miscellaneous documents:**

- **RULE 26 INITIAL DISCLOSURES**
- **INITIAL DISCLOSURES OF FIELDWOOD ENERGY, LLC**
- **RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **EMPLOYER'S FIRST REPORT OF INJURY OR OCCUPATIONAL ILLNESS**
- **COMPLAINT**
- **ANSWERS TO INTERROGATORIES PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **FIRST SUPPLEMENTAL ANSWERS TO INTERROGATORIES PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **ANSWERS TO SECOND INTERROGATORIES PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP,LLC**
- **ANSWERS TO INTERROGATORIES FOR PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **ANSWERS TO REQUEST FOR ADMISSIONS PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **RESPONSES TO SECOND REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY PLAINTIFF BY DEFENDANT, FACILITIES CONSULTING GROUP, LLC**
- **FIELDWOOD ENERGY, LLC'S OBJECTION TO RULE 30 B6 DEPOSITION**
- **ULTIMATE WORK AUTHORITY AGREEMENT FORM FOR SIMULTANEOUS OPERATIONS**
- **JOB SAFETY ANALYSIS**
- **PHOTOGRAPHS**
- **FIELDWOOD INCIDENT REPORTING AND SAFETY TRACKING FORM**
- **FIELDWOOD ENERGY - SAFETY AND ENVIRONMENTAL POLICY**
- **EMAILS**
- **FIELDWOOD ENERGY, LLC'S ANSWER TO REQUEST FOR ADMISSION FOR POUNDED BY RICHARD PADGETT**

- **FIELDWOOD ENERGY, LLC'S FIRST AMENDED AND SUPPLEMENTAL OBJECTION AND RESPONSES TO SECOND REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY, LLC'S FIRST AMENDED AND SUPPLEMENTAL OBJECTION AND RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY RICHARD PADGETT**
- **ULTIMATE WORK AUTHORITY AGREEMENT FORM FOR SIMULTANEOUS OPERATIONS**
- **FIELDWOOD ENERGY, LLC'S OBJECTIONS AND ANSWERS TO INTERROGATORIES PRO POUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY, LLC'S ANSWERS TO REQUEST FOR ADMISSION FOR POUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY, LLC'S OBJECTIONS AND ANSWERS TO SECOND INTERROGATORIES BUT POUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY, LLC'S OBJECTIONS AND RESPONSES TO SECOND REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY, LLC'S OBJECTIONS AND ANSWERS TO THIRD REQUEST FOR PRODUCTION FOR POUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY, LLC'S OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS FOR POUNDED BY RICHARD PADGETT**
- **FIELDWOOD ENERGY – INCIDENT INVESTIGATION FORM**
- **FIELDWOOD ENERGY – ROOT CAUSE ANALYSIS**
- **FIELDWOOD ENERGY – SAFETY ALERT – FALL INCIDENT**
- **MEASUREMENTS, VIDEO AND PHOTOS PRODUCED BY FIELDWOOD INSTEAD OF MAKING AN INSPECTION.**
- **FALL PROTECTION CHECKLIST**

# II ACCIDENT DESCRIPTION

Mr. Richard Padgett was employed as a Pipe Fitter by Fluid Crane and was assigned to work in the Grand Isle 43 field, which included the WD 70D platform, for Fieldwood Energy, located in the Gulf of Mexico. Fieldwood Energy had several employees working both in the field and on the bank during Mr. Padgett's accident, among them were: Mr. Blaine Marcantel, the Area Production Foreman; Mr. Gregory Soileau, the Field Foreman; Mr. Richard Dunham, the Production superintendent; Mr. Michael Stephens, the Field PIC ;and Mr. Clint Broussard, the Construction Foreman . Wood Group had Mr. Randal Mitchell, A Operator on the platform, and was the production PIC at the time of Mr. Padgett's accident. Facilities Consultants had Mr. Jason Simmons, consultant and construction PIC for that side of the work, and as such was overseeing/supervising the work of Fluid Crane's crew. The Fluid Crane's crew consisted of Mr. Khamla Vilayphanh (Chicago), Supervisor; Mr. Jason Pierre, a welder; Mr. Richard Padgett, a Pipe Fitter; and Mr.

Rodney Frederick and Mr. Chris Randall, two riggers. Island Operating had Mr. Dayden Girouard, a C Operator on the platform. United Fire and Safety had Mr. Timothy Worsham, the Fire Watch. Diverse Scaffolding Solutions had two workers present.

On October 10, 2017, Simmons and the construction crew returned to WD 70I/L where they were performing hurricane damage repairs to the handrail and grating on that platform. At some point in time, they loaded their equipment onto the ***M/V TORTUGAS*** with the intention of going to WD 70S/X to repair, once again, the hurricane damage to the platform. At the same time, Mr. Randall Mitchell and a Linear employee were on WD 70D working on a downed compressor. The platform and all the wells tied into that platform were shut in and no production was moving through the platform because of the downed compressor. During their visit, a rainstorm came through and Mr. Mitchell noticed that the drain system for the platform was damaged and leaking a great deal of water onto the deck below deck. Mr. Mitchell call the field's PIC, Mr. Michael Stevens, and reported the damage. Mr. Stevens reported the findings to Mr. Gregory Soileau, the Field Foreman, who then decided that the problem had to take precedence over the work the Fluid Crane's crews were doing. While enroute to WD 70 S/X, Mr. Gregory Soileau called and informed Mr. Simmons to travel to WD 70D to repair the broken drain lines. The drain repair needed to take precedence over the repair of the handrails and grating on the other platforms because, besides the compressor being shut down rendering the field non-operational, the leaking drain line also rendered the field non-operational. These two items needed to be fixed so the production to this platform could be brought back on line. The Fluid Crane crew traveled on the ***M/V TORTUGAS*** to WD 70D to begin the process of repairing the broken drain lines.

Upon arrival at WD 70D on the day of the accident, Mr. Randal Mitchell showed Mr. Jason Simmons and Mr. K. Vilayphanh the problem with the drain line. That inspection would necessarily expose the hazard of the Fluid Crane's crew being required to work from heights, as the piping that Mr. Padgett would have to stand on was over 8 feet above the deck. Mr. Randal Mitchell operated the crane, and Mr. Jason Simmons and the Fluid Crane crew off-loaded their equipment and began the process of the drain repair project. Ultimate work authority for all platform operations on October 10, 2017 aboard WD 70D was assigned to Randall Mitchell, Wood Group. Mr. Jason Simmons was assigned Construction PIC for this drain repair project. According to Mr. Padgett, the drain line was separated and off kilter, meaning that the crew would have to install a come-a-long to pull it back into position.

Mr. Padgett climbed on the Pig Catcher to access a structural beam, and then stood on a pipe, to install a beam clamp to act as an attachment point. Mr. Padgett attached his fall-protection-harness safety lanyard to the drainpipe. As Mr. Padgett leaned up against the pipe, the pipe separated and fell to the deck, bringing Mr. Padgett with it. Mr. Padgett sustained his injuries at this time.

# III ASSESSMENT / OPINIONS

## OPINION NO. 1

### EQUIPMENT PROBLEM

**FIELDWOOD ENERGY, MR. MITCHELL, AND MR. SIMMONS'S FAILURE TO SECURE SCAFFOLDING FOR THE FLUID CRANE'S CREW TO WORK OFF OF WHILE INSPECTING THE SITE FROM HEIGHTS, PREPPING THE SITE AND REPAIRING THE DRAIN LINE ON WD 70D PLATFORM.** It is my opinion based on my education, training and experience that the work assigned the Fluid Crane's crew could not have been performed safely without the erection of a scaffold to access the work location. Without the scaffolding, Mr. Padgett was required to climb onto the pig trap to access the work site and then stand on a pipe 7.75' (93") off of the deck . As the safety codes require fall protect above 6 feet, Mr. Padgett was required to wear fall protection. Even if Mr. Padgett's work was limited to a simple inspection of the drain pipe site while climbing on the pig trap and working while standing on a pipe, Mr. Padgett needed to be provided with scaffolding for the following reasons:

First: Standing on a rounded pipe is very hazardous and unsafe even if the pipe is lying to the deck. It is far more hazardous when suspended almost 8 feet above the deck. We see Olympic athletes fall off of balance beams all the time, and that sureface is flat on top.

Second: The industry safety codes requires that attachment points for use in fall protection by capable of supporting a 5,000 lb load. There were no attachment points provided to Mr. Padgett for him to use to attach his safety lanyard to. The drain pipe he was forced to use as an attachment point obviously would never be considered suitable for an attachment point under any conditions. There were no pad eyes welding to the ceiling of this work area to be used as a certified attachment point. As a matter of fact, just prior to Mr. Padgett's accident, he was attemping to install a beam clamp to attach his lanyard to so he would be attached to a suitable fall protection attachment point. Unfortionally, this attachment point would have also not been suitable to attach his fall protection lanyard to as we see below.

Third:The industry safety codes state that the maximum fall distance allowed by a worker is 6 feet. Falls of more than 6 feet have proven to cause injuries to workers (ANSI Z359.1). Hence, the lanyard attached to the fall arrest harness is limited to 6 feet long. Therefore, the structural attachment point must be at or above the "D" ring on the back of the fall arrest harness worn by the worker. Attachment points above the "D" ring would allow the worker to fall less than 6 feet. Attachment points below the "D" ring would allow the worker to fall further than 6 feet. The bottom of the beam was 43.5" above the pipe that Mr. Padgett was standing on. Assuming the beam clamp would subtract an additional 3.5" from that distance, making the distance 40" above the pipe that Mr. Padgett was standing on. The lanyard attachment point would be well below Mr. Padgett's "D" ring on his fall arrist harness, which is attached to the shoulder area of Mr. Pagett.

Mr. Padgett was standing on a pipe 93" (7.75') off of the deck. The attachment point of the beam clamp would have been another 40" (3.33'). This means that Mr. Padgett would first fall an 40" (3.33') before his fall protection lanyard would be activated. Mr. Padgett would fall 3.33 feet before his fall arrist system would start to stop him from falling. The lanyard attached to Mr. Padgett's fall arrist harness was 6 feet. Mr. Padgett would fall 3.33 feet plus the 6 feet for the lanyard. Mr. Padgett would fall 9.33 feet before he would stop falling. Mr. Padgett was standing 7.75' feet above the deck. The fall

protection he was wearing would have allowed his feet to crash down onto the deck almost 2' before Mr. Padgett hit the end of his lanyard.

There was no place to attach fall protection underneath on the celar deck. Therefore, scaffolding was the only safe way to reach the damaged piping.

According to the Fall Protection Checklist, Mr. Simmons was the person responsible for assuring the crew that the attachment points were safe and suitable to be used by the crew. Mr. Simmons was responsible for determining which attachment points Mr. Padgett was going to use and their suitability to withstand a 5,000 lbs weight. Mr. Simmons should have determined that there were no suitable attachment points above this celar deck and that scaffolding was the required method.

Mr. Mitchell, as the production PIC was responsible for assessing the hazards of this job, which would include the provision for providing this crew with suitable attachment points. Mr. Mitchell signed off on the JSA, which allegedly covered the attachment points.

The needed scaffolding was left on another platform, WD 70I/L, and was not retrieved until after Mr. Padgett's accident. WD 70I/L was in close proximity to WD 70D, one mile, and the ***M/V TORTUGAS*** should have been sent to WD 70I/L to retrieve the scaffolding prior to Mr. Padgett climbing onto the pig trap to attach a beam clamp. The vessel was sent to WD 70I/L to retrieve a valve and apparently, some scaffolding material, as the testimony indicates that Mr. Mitchell unloaded the valve just before Mr. Padgett's accident. The scaffolding remained on the vessel.

# OPINION NO. 2

## COMMUNICATION PROBLEM

**MR. GREGORY SOILEAU'S FAILURE TO CONDUCT PROPER COMMUNICATIONS WHEN ASSIGNING A WORK ASSIGNMENT TO THE CREW, AND MR. JASON SIMMONS' ALLEGED FAILURE TO VERIFY THE IMPORTANCE AND TIME SENSITIVE NATURE OF THE ASSIGNMENT IF ONE EXISTED.** It is my opinion based on my education, training and experience that if Mr. Soileau did not mean for the Fluid Crane's crew to proceed to WD 70D to hastily repair the drain line so the platform could return to full production, he should have clearly stated that to Mr. Simmons. Mr. Soileau testified that he told Mr. Simmons that the repair to the drain line took precedence over the work the Fluid Crew was performing. It is not surprising that Mr. Simmons, having extensive experience working in the oil and gas business, knew that a large amount of production not traveling through WD 70D, as the field was shut in, would be on the verge of an emergency from the Field Foreman's point of view.

The production emergency notwithstanding, Mr. Simmons had a duty to his crew to determine the nature of the production emergency, the required work necessary to abate the repairs, and to determine

the safest way to proceed with the repairs. The safest way to proceed with the repairs would have been to send the ***M/V TORTUGAS*** to retrieve the necessary scaffolding needed to make the repairs.

The testimony indicates that this drain had been damaged for some time and was repaired using duct tape to hold the drain both together and keep it from leaking. A leaking drain is in violation of the federal environment rules. Testimony also indicates that this platform, and the entire field, would have had to be shut down to repair this line. The use of duct tape as a stopgap measure to continue to produce shows Fieldwood's mindset relating to the emergency allegedly imagined by Mr. Simmons when he was told to stop what he was doing and divert his crew to repair a drain line on another platform.

# OPINION NO. 3

## JOB PRE PLAN AND JOB SAFETY ANALYSIS PROBLEM

**MR. JASON SIMMONS' FAILURE, AS THE CONSTRUCTION PIC, TO PERFORM A HAZARD ANALYSIS, JSA, THAT IDENTIFIED THE HAZARDS AND RISK OF THE WORKPLACE, AND TO ELIMINATE, CONTROL OR MINIMIZE THOSE HAZARDS, .** It is my opinion based on my education, training and experience that Mr. Simmons violated Fieldwood Energy's safety policy regarding his duties as the construction PIC for this drain pipe repair work. According to Fieldwood Energy – Pre-Job Planning FWE 00244 – STATES:

**Scope**
It is the policy of Fieldwood Energy for its Production Foreman, Field Foreman, Person in Charge (PIC), Lead Operator, or **Consultant** to be responsible for: **(Emphasis added)**

- Identifying hazards and risks of the workplace and provide information to all affected personnel.
- Eliminate, control, and/or minimize hazards in the workplace.

**Responsibilities**
The Fieldwood Energy Area Foreman, Fieldwood Energy Production Foreman, Person in Charge (PIC), Lead Operator or **Consultant** is responsible for: **(Emphasis added)**

- Providing leadership and commitment, and holding personnel accountable for implementation of this procedure.
- Communicating to the workforce Fieldwood Energy's commitment to the Stop Work Authority process.
- All On-Site Fieldwood Energy Employees and/or Contract Employees are responsible for:
- Utilize Stop Work Authority if any unsafe condition or act is observed that could affect the safety of personnel and/or the environment.
- **Actively participating as necessary in all Pre-Job Planning including but not limited to: (Emphasis added)**
    - Daily Work Review and Permit Storage (DWRAPS)
    - Job Safety Analysis

- Pre-Job Safety Meetings
- Permit to Work Systems
- Hazards Analysis
- Management of Change
- Pre-Startup Review

Mr. Jason Simmons failed to follow Fieldwoods Energy's safety policy relative to JOB SAFETY ANALYSIS as found in Fieldwood Energy – JOB SAFETY ANALYSIS PROCEDURES -FEW 11245- STATES:

**Purpose**
The JSA is a technique used to identify risks to personnel associated with their job activities. JSAs
are also used to determine the appropriate mitigation measures needed to reduce job risks to personnel. The JSA must include all personnel involved with the job activity.

**Responsibilities of Person In Charge**
If there is a Production Representative on location, he will be considered the Person-In-Charge (PIC) on an OCS facility. For remote unmanned locations, when a Production Representative is not on location, the Consultant or Supervisor of the project will assume the role of designated Person in Charge (PIC) and the responsibilities outlined within this procedure.

**The Person in Charge (PIC) must:**

- Ensure JSAs are completed for all jobs or work activities such as, but not limited to normal operations, testing, maintenance, repairs, construction, wireline, etc. occurring on the facility according to Fieldwood safe work practices prior to beginning work.
- Ensure JSAs identify, analyze, and record the steps involved in performing a specific job.
- **Ensure JSAs identify existing or potential safety, health, and environmental hazards associated with each step. (Emphasis added)**
- **Ensure JSAs contain recommended action(s) and/or procedure(s) that will eliminate or reduce hazards and the risk of a workplace injury, illness or environmental impact. (Emphasis added)**
- Approving all JSAs on the facility/location before personnel start the work.
- Communicate all jobs or work activities occurring on the facility to all personnel on board daily
- and document as a "Daily/Pre-Job"-meeting- on the Safety Meeting Report Form Section B, Chapter 2, Part D.
- When any work/job is added, or scope of planned work changes, the PIC will communicate the addition or change to all personnel on board, and/or the Consultant/Supervisor of each job/work. The addition or change will be documented on another Safety Meeting Report Form and signed by the PIC, Consultant and/or Supervisor(s) of all work/jobs.

- The Consultant or Supervisor(s) of each job will communicate any changes to their individual crews.
- All pre-job meeting report forms will be loaded in the DWRAP system daily.

Mr. Jason Simmons failed to identify hazards and risks of the workplace and provide information to all affected personnel, and Eliminate, control, and/or minimize hazards in the workplace. Mr. Jason Simmons failed to determine the hazards of his crew working from heights, failed to determine that scaffolding would be the safest way to perform this job, and failed to understand that the crew needed a sound platform, or scaffolding, from which to work.

# OPINION NO. 4

## WORK PROCEDURE PROBLEM

**MR. JASON SIMMONS' FAILURE TO PROPERLY PLAN FOR THIS WORK, PERFORM A HAZARD ANALYSIS TO INCLUDE ALL HAZARDS AND MITIGATE THOSE HAZARDS BY INSTALLING SCAFFOLDING FOR THE CREW TO WORK FROM.** It is my opinion based on my education, training and experience that Mr. Jason Simmons, as the construction PIC, failed to perform a hazard analysis that included the hazard of this crew working from heights without the use of scaffolding. As soon as Mr. Simmons saw that the drain pipe was under the deck, he knew or should have known that the crew would necessarly have to work from heights. Additionally, with the amount of construction knowledge that Mr. Simmons had, he knew or should have known that Mr. Padgett needed an engineered attachment point capable of holding 5,000 lbs to attach his fall protection lanyard to. Mr. Simmons should also should have known that the attachment point needed to above the worker's head. Mr. Simmons should also have known that the drain pipe would not be considered a suitable attachment point for fall protection. Solid footing can only be provided with the use of a scaffolding. Mr. Simmons had the scaffolding erection crew on board the platform and all he had to do was send the ***M/V TORTUGAS*** to WD 70I/L to retrieve the scaffolding. Instead, Mr. Simmons stood by in the near vicinity watching Mr. Padgett climb the pig trap, attach his lanyard to the drainpipe, and watch as Mr. Padgett fell after leaning on the drainpipe.

Mr. Jason Simmons violated Fieldwood Energy's Safety policies regarding Fall Protection FWER 00254 – STATES:

**Hazard Analysis**
When a job task will create the possibility or potential for a fall, the Person in Charge (PIC), Lead Operator or Consultant should consider methods in which to address fall hazards in the following order:

***Fall Elimination***

- Eliminate the need to perform elevated work.

***Fall Prevention***

- Fall prevention may be accomplished by the use of manlifts, **scaffolds**, or temporary access ways with standard hand-rails, midrails, and toe boards. **(Emphasis added)**

***Fall protection***

- Use of proper fall arrest systems such as: full body harnesses, "Y" lanyards, lifelines (both vertical and horizontal), retractable lifelines, etc. This equipment shall be made available to employees.

Mr. Jason Simmons failed to provide his crew with the available scaffold left on WD 70I/L. As the above safety rule states, if the need to eliminate elevated work is not possible, which in this case it was not, the PIC must use a manlift, not available, a scaffold, available one mile away on WD 70I/L temporary access ways, platforms that was not available. If none of the above were feasible, then and only then should the PIC allow his crew to work from heights using a full body harness attached to a properly engineered attachment point as fall protection.

# OPINION NO. 5

## STOP WORK AUTHORITY PROBLEM

**MR. RANDELL MITCHELL, MR. JASON SIMMONS AND OTHER WORKERS ON THE PLATFORM'S FAILURE TO USE THEIR STOP WORK AUTHORITY TO STOP THIS JOB WHEN THEY KNEW OR SHOULD HAVE KNOWN THAT THE CREW WAS GOING TO HAVE TO WORK FROM HEIGHTS WITHOUT THE USE OF THE AVAILABLE SCAFFOLDING.** It is my opinion based on my education, training and experience that the senior perosnnel on the platform, Mr. Randall Mitchell (UWA), and Mr. Jason Simmons, as the construction PIC, failed to use their stop work authority when they determined that the crew was going to be forced to work from heights without the use of the availiable scaffolding left on WD 70I/L.

Multiple members of the Fluid Crane crew have testified that the crew told Jason Simmons that scaffolding was needed on the day of the accident to start the drain repair project on WD70D and that Simmons refused to take to time to pause the job and obtain the requested scaffolding. These crew members further testify that Simmons ordered them to proceed with the drain repair project without scaffolding. The crew was in fear of losing their job and proceeded as ordered by Simmons. Simmons denies this. If it is determined that the crew made the request and Simmons refused to obtain scaffolding ordering the job to proceed this is a clear example of the crew exercising stop work authority and being ignored by Simmons and ordered to proceed. The Fieldwood Energy Safety & Environmental Policy was violated.

**FIELDWOOD ENERGY**
**SAFETY & ENVIRONMENTAL POLICY**
FEW 00235

Fieldwood Energy is committed to the safety and health of our employees, contractors and protecting the environment in which we operate.
To meet these commitments, Fieldwood employees and its contractors are expected to adhere to the following:

- Leaders must demonstrate a commitment to safety and protecting the environment in their decisions and behaviors.
- **No business objective will allow safety to be compromised. (Emphasis added)**

**OPINION COMMENT:** Mr. Simmons violated this by allowing a business objective, the repair of this drain line, to compromise the safety of his crew.

- **All work will be conducted in compliance with Fieldwood's Safety and Environmental Management System (SEMS) and Safe Work Practices. (Emphasis added)**
- Each and every individual must take personal responsibility for safety.
- Safety and Environmental issues must be **promptly identified,** evaluated and addressed.
- All work must be **properly planned, hazards identified and mitigated before work can begin (Job Safety Analysis).**
- Everyone must feel empowered to raise concerns **without fear of retaliation or intimidation**. Everyone has Stop Work Authority and is expected to use it. **(Emphasis added)**
- Trust and Respect for one another must permeate throughout the organization.
- Work must be conducted in compliance with all federal, state, local and industry environmental, health, safety rules and regulations.

**OPINION COMMENT:** Mr. Simmons violated these as outlined in the above opinions concerning, JSA, Stop Work Authority, Job Pre-Planning, etc.

Mr. Mitchell (UWA) and Mr. Simmons (PIC) had full authority to stop this job and wait until the scaffolding was delivered to this platform prior to forcing Mr. Padgett to climb up on piping to perform the required hazardous job steps, including used mechanical equipment that required a stable footing.

**FIELDWOOD ENERGY**
**STOP WORK AUTHORITY**
BSEE 30CFR 250.1930
FEW 00239

**Purpose**
The purpose of this procedure is to empower every individual with the authority to stop work when an unsafe condition or act is observed that could affect the safety of personnel and/or the environment.

Fieldwood Energy is committed to providing a safe work environment. All personnel have the Responsibility and authority to stop the job or decline to perform an assigned task when an imminent risk or danger exists. Under NO circumstances shall repercussions be directed towards personnel who exercise Stop Work Authority.

NOTE: Imminent risk or danger means any condition, activity, or practice in the workplace that could reasonably be expected to cause:

(1) Death or serious physical harm; or
(2) Significant environmental harm to:
(i) Land;
(ii) Air; or
(iii) Mineral deposits, marine, coastal, or human environment.

The use of Stop Work Authority must be discussed in all pre-job planning and Job Safety Analysis (JSA).

**If an unsafe condition or act is observed:**

- Take immediate action by stopping the work.
- Individuals who receive a notification to stop work must comply with that direction immediately.
- Notify the immediate supervisor of the conducted work.
- **The immediate supervisor of the conducted work (person in charge) is responsible for ensuring the work is stopped in an orderly and safe manner. (Emphasis added)**

**OPINION COMMENT:** Mr. Simmons was the PIC and he would have been the person that Mr. K. Vilayphanh or Mr. Padgett would have reported a stop work. Of course, Mr. Simmons already knew, or should have known, of the unsafe condition, so it would have been futile for either man to use their stop work authority. Both Mr. Mitchell (UWA) and Mr. Simmons (PIC) had full authority to stop this job.

- Discuss and/or determine corrective measures with all involved.
- Review and/or revise JSA as necessary.

Additionally, the following documentation may shed a light on why Mr. K. Vilayphanh or anyone else on the Fluid Crane's crew did not use their Stop Work Authority.

Fieldwood Energy's **Incident Investigation Report** states that the Fluid Crane's crew believed that if they had used Stop Work Authority, they would **not be allowed back the next hitch.** FEW 00006.

Mr. Ross Bonin, Fluid Crane's HS&E Director also stated in his email dated November 1, 2017. "During the meeting, the crew mentioned that they felt pressure and feared that they would be **"run off"** if they were to stop the job for a safety concern. We explained to them that we have the upmost confidence in the Fieldwood's upper management that if brought to their attention, they would not allow retaliation for using SWA. At the conclusion of the meeting, we feel

confident the crew feels better about and will be willing to using SWA should the situation arise." FEW 00435- **(Emphasis added)**

**FEE SCHEDULE:**

Hourly charges are from portal to portal.
All expenses reimbursed by the client.
$1920.00 for deposition and trial testimony (minimum 3 hour charge, includes preparation time)
$320.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours

Robert E. Borison

Robert E. Borison
President
Total Safety Services, Inc.

## APPENDIX

## DEPOSITION TESTIMONY USED TO FORM MY OPINION

***This pagination may not follow the transcript of the official depositions.***

**MR. RICHARD PADGETT TESTIFIED AS FOLLOWS:**

Page 31: Q. And you ended work -- your employment with

Page 31: Q. And you ended work -- your employment with Fluid Crane when this accident happened? A. Yes, sir.

Page 40: Q. So as a fitter you would have worked directly with the welder? A. Yes, sir. Q. And what welder did you work mainly with? Was it -- A. Pierre -- Jason Pierre.

Page 45: Q. So who would have been the two riggers? A. Rodney and Chris. Q. And you would have been the fitter? A. Yes, sir. Q. And then who was the welder? A. That was Jason Pierre. Q. And the supervisor? A. Chicago.

Page 46: Q. Correct? Someone from whom? A. Newfield would tell Jason Simmons, our consultant, what to do, and then he would come tell us, you know, what we needed to do.

Page 47: Q. That's okay. You mean Fieldwood? A. Fieldwood, yes. Q. Okay. Now, Jason Simmons worked for Facility Consultants, right? A. I guess. He was a consultant there. Q. He was a consultant there? A. For us, yeah.

Page 47: Q. What does that mean, he was the consultant for us? What do you mean by that? A. Like an inspector. Yeah, he would make sure that -- he would just make sure that we would get everything done and make sure everything was done right, you know, and then report back to them.

Page 48: Q. He was kind of like the guy in charge, the company man? A. Yes, sir. Q. Is that right? A. Separate than Fieldwood, though.

Page 48: Q. Do you know who he worked for? A. No.

Page 51: Q. All right. So you were going to back-load some materials off of the platform onto the boat? A. Yes, sir. Q. The weather was bad, so you had to wait? A. Yes, sir.

Page 52: Q. And then when the weather cleared up, did you go and back-load the -- A. Yes, sir.

Page 53: Q. Okay. And why didn't you go to that platform? A. When we got on the boat, they got a call from someone else on the radio and told us we needed to go to another platform and check something out, while we was traveling on the boat. Q. And do you know what platform that was? A. No, sir.

Page 55: Q. You back-loaded off of a platform your equipment? A. Uh-huh (yes). Q. Got in the boat and you were heading to a platform, some platform, to do some work? A. Yes, sir. Q. Enroute to that platform, y'all got a call to go to another platform to do some work? A. Yes, sir.

Page 56: Q. Is that correct? This says -- I'm looking at something. It just says 70D, WD-70D. A. Okay.

Page 56: Q. All right. Do you recall, to whatever platform it was that you were ultimately going to where you got hurt, what work you were instructed to do? A. Yeah. We were instructed to repair some drain lines.

Page 58: Q. And that's normal type of work for Fluid Crane to do on a rig? A. Well, that's the first time I did it for them. I mean, it's a drain line -- they would usually -- if it started rusting, they would usually just replace the whole drain. Just try to, you know. But I think they were just trying to get it done in a hurry to make sure nothing was, you know, getting in the water.

Page 59: Q. Okay. And when you got on the platform, did you notice any problems from the drain lines? A. Well, yeah. I mean, they were completely separated from each other and off kilter from each other. They had shifted.

Page 59: Q. Who instructed you as to what to do? Like, you know, what do we need to do first? How did you know what to do? A. Well, we was there with my supervisor and Jason, and we was seeing if we needed to get up there and pull the pipe over with some come-a longs and get it, you know, even enough to where we could get it up there and pull it up where the welder could get some weld on it. Q. Okay. A. You know. Q. All right. And did you have a safety meeting for that job? A. Yes, sir.

Page 63: Q. Okay. And then -- so tell me what happened. So you, and Chris, and Jason are there, and you're determining where and how many come-alongs you're going to need. You're getting started, right?
Page 64: A. Okay. Well, we'd ask Jason -- you know, we
Page 64: needed some scaffolding up there to begin with, and -- Jason who? The consultant. Okay. You told him you needed scaffolding? Yes. And the scaffold was at another platform. We had left it somewhere else because we didn't think we were going to need it on the job we was going to.
Page 64: Q. Whose scaffolding is that? A. I'm not for sure what the company is. It's a different company they use for the scaffolding. They're out there with us all the time, also. They always have one or two scaffold builders.
Page 64: Q. Okay. And then what happened? A. And we told him we needed some, and they didn't -- he didn't want to go send the boat
Page 65: after it to go get any. So they pretty much told us, you know, to make do with what we had, to try to get up there and try to get it pulled over without the scaffolding.
Page 65: Q. Okay. So what did you do? A. I climbed up in the rack right there where I would think was -- pretty much going to have to hook up my first come-along. And I was hooking -- you know, we had two lanyards, I was hooking one lanyard up, and I hooked one lanyard onto the pipe, and I was trying to hook another lanyard up above me on a beam, where they had these little beamer things we hooked to. And I was trying to hook up to that one, and I was a little bit -- couldn't quite reach it, so I put my hand on the pipe, just trying to get me another inch or so, and that's when the whole pipe fell down, the whole system fell down, and I fell with it. I don't know if I fell, or I was pulled down, or --
Page 67: Q. Did y'all have any discussions before you started this operation as to where you were going to place your lanyards? A. Yes, sir. Because I had to get the beamer equipment for that.
Page 67: Q. And who did you have that conversation with? A. With Jason and Chris. Q. Jason who? A. Pierre.
Page 69: Q. Okay. A. I was hooked off to the pipe itself and I was trying to hook my other one up, so I could unhook the other one. You've always got to stay a hundred percent tied off. I had this one hooked up, and I was reaching up to try to hook the one above me when -- once I would have got that hooked up, I would have unhooked the other one.
Page 69: Q. That's what I was trying to talk about, the first. So the first lanyard that you hooked up -- A. Right. Q. -- was to the pipe? A. Yes, sir. Q. The pipe that y'all were going to repair? A. Yes, sir. As far as I know, it was the only
Page 70: one right there in that area, you know.
Page 70: Q. How far above the deck, or solid ground where you were standing, was that lanyard?
Page 71: A. I wouldn't know exactly, but I would -- anywhere from 12, 15 feet, I guess. Somewhere in that area, something like that.
Page 71: Q. So the first lanyard you would have hooked up to would have been the valves? A. Well, it's a valve system, I mean.
Page 72: Q. And then from there you hooked up the second lanyard, I believe, to the drain pipe? A. Well, I think -- I think I hooked up twice to the valve system before I got all the way up there, and then we went to the --
Page 73: Q. To the beam. All right. And it was when you went to tie off to the beam that you grabbed onto the pipe, the drain pipe? A. Well, I just -- I put my hand on it like that (Indicating).
Page 73: Witness indicating palm down, fingers out.

Page 73: THE WITNESS: Yes. I put my hand on it to try to get up a little bit higher and that's when it tumbled down.

Page 74: Q. Did you discuss where you were going to hook up to? A. Not at the time. We hooked up to anything to get up there. That's when it was brought up that we needed the scaffolding and that Jason had told Jason that and, you know, how are we

Page 75: going to get up there and weld that out and everything if -- because it was not in a real good spot. I mean, the spot we went to, the first, was probably the -- even the better spot. There was worse spots than that that we had to repair after we got that one done, that would have been even worse. So, I mean -- So you're telling me you were fearful? Yes, sir. But you did it anyway? Yes, sir.

Page 75: Q. Did you raise any objections during the meetings? A. Yeah. I said we raised them to Jason and told him we need some scaffolding.

Page 76: Q. I'm going to show you a job safety analysis. I'm looking at -- and I'm going to show it to you -- a job safety analysis. It says Fieldwood Energy, Job Safety Analysis,

Page 1 of 6. And it's identified by Bates stamp number FWE 00021, 22, 23, and 24. Okay? It's dated 10/10/2017. And it says here Describe Job Being Analyzed. It says Repair/ -- Is that skillet? A. A skillet, yeah.

Page 77: Q. Yes, sir. And it says Drain line. And it says that the JSA, the job safety was conducted by Khamla -- A. That is my supervisor, Chicago.

Page 77: Q. Okay. I'm going to spell the name. The first name is K-H-A-M-L-A and the second name is V-I-L-A-P -- I'm sorry, V-I-L-A-Y-P-H-A-N-A. I'm going to let you look at it and see if you --

Page 78: Q. And you did discuss the dealing with heights, what it says here (Indicating)? A. Yes, sir. Q. Fall protection (Indicating)? What is this, fall protection -- A. Yeah. Q. -- procedure (Indicating)? A. Uh-huh (yes).

Page 79: Q. All right. And at the bottom of

Page 2 of 6, you see where it says Remove skillet/drain line? A. Yes, sir. Q. Was that the job that you were doing at the time that you got hurt? A. Well, there was a skillet in one of them. Q. Uh-huh (yes). A. And we had to take that out. But, no, we wasn't taking that one out at the time. That was a different area of it. The drain line was hooked to -- yeah, because what it was, it was going down to the other drain line going to the sump. That's where the skillet was, to make sure no fumes was coming up when we had to weld.

Page 80: Q. When you're supposed to tie off? A. Yes, sir. Q. You see it? It says tie off 6 feet or above? A. Yes, sir. Q. Okay. Eye prevention. Proper PPE for job task. Buddy system. I guess Jason Pierre would have been your buddy on this particular job, right? A. Yes, sir. And Chris.

Page 82: Bates stamp FWE 00043 and

Page 82: FWE 00044.

Page 83: Q. So I'm looking at P3. Explain -- can you tell me where are we on the rig, on the platform? Are we on the bottom deck or middle deck? A. Middle deck. This is the top deck up here (Indicating).

Page 84: Q. Right. And I'm looking here, this big one,

Page 84: did you step on this big one right here (Indicating)?

Page 84: A. Yes, sir. Q. And that's got some writing on it. Just really quickly there's one that says 71-D [sic] INCOM? A. Yeah.

Page 85: For the purposes of the record, the two of you are discussing a series of horizontal pipes located on the right side of P3; is that correct?

Page 85: Yes.
Page 85: Q. And so tell me, so how did you -- did you step on this horizontal pipe with the writing 71-E? A. Yes, sir.
Page 85: Q. Where was the first place you tied off at? A. I'm not for sure. I mean, it was somewhere, you know, up in here where I could climb up to the next one. I can't remember exactly where I tied off at (Indicating).
Page 88: Q. Let's see how we -- why don't you trace over that with the black and see how the black works. A. (Witness complies.) Q. That was the drain pipe that you were going to work on -- ultimately work on, correct? A. Yeah. One part of it, yeah. Q. That's where you were headed to do before the accident happened? A. Yes, sir.
Page 90: Q. So where would it have run from? A. It was very near here at one point of it, but it was like a little bit off where we had to get it pulled over and pulled up to weld it. It was like maybe two or three inches off from this area (Indicating). Q. Was it running down, or was it running vertically out, or horizontally out? A. This right here was supposed to hook up to here, as far as I know (Indicating). Q. So why don't you put another arrow there. A. That's what it looks like (Witness complies). Q. And why don't you mark this Number 1 (Indicating). A. (Witness complies.) Q. And why don't you mark this Number 2
Page 90: (Indicating). A. (Witness complies.) Q. Now, correct me if I'm wrong, but what you
Page 91: were trying to do is connect Number 1 to Number 2? A. Right.
Page 92: This section of drain piping is on the deck after it fell from above, and it was running horizontally up underneath the beams of the upper deck to capture multiple drains as they drained -- THE WITNESS: Right.
Page 95: Q. But in any event, when you were going up there, this Number 2 was still up on the -- up towards Number 1, correct?
Page 96: Q. I'm going to call it drain pipe. When you were climbing up right before your accident, the drain pipe was up underneath these beams on the top of P3, correct? A. Yes, sir.
Page 96: Q. Okay. Were any lanyards attached to the drain pipe at the time that you put your hand on it? A. Yes, sir.
Page 97: Q. And it was when you touched the drain pipe that the drain pipe fell? A. Yes, sir. Q. Causing you to fall with it? A. Yeah, it pulled me down, yeah, to it.
Page 99: Q. I understand. So you were going to climb up with the use of your lanyards, ultimately get to this I-beam, and then what were you going to stand on -- and then you were going to try to affix this drain pipe at the top of P3, correct? A. Yes, sir. Q. And what were you going to stand on once you got up there? A. Just these pipes running everywhere.
Page 100: Q. Of the valve where we see Contractor was standing here (Indicating). A. Uh-huh (yes). Q. Is that about where you think you might have been standing? A. Yeah, it would have been around that area, close.
Page 100: Q. And then you were going to have a come-along sent up to you by the use of a rope, and you were going to attach it to this, what we see is this drain pipe down on P2 (Indicating)? A. Yes, sir.
Page 141: A. No, sir. I couldn't tell you exactly how many it is. At least three to four, you know. Q. And these are basically ratchet-type come-a longs? A. Yes, sir. Q. You have an anchor point -- A. A chain. Q. Yeah. You have an anchor point and you have a ratchet handle, I think, that you described -- A. Yes, sir.

Page 143: Q. Okay. That's fine. This white pipe that has the markings on it 71-E, do you know how far the top of that pipe is off the deck (Indicating)? A. About maybe 30 inches, I guess. I guess.
Page 143: Q. That's fine. The top, this black horizontal pipe that's located immediately above the white pipe that's marked 71-E, okay, that horizontal pipe, how far is that off the deck (Indicating)? A. I'd say probably 8-foot, I guess. I don't know.
Page 147: this wheel
Page 147: valve line that says Contractor was standing here, how far was that above the deck in your estimation? A. I'd say 10 to 12 feet.
Page 154: Q. Okay. In fact, did anyone discuss lanyard
Page 155: placement before you began moving up to the work area at West Delta 70D? A. Not that I recall, no.
Page 155: Q. And, again, you didn't need anyone, Jason Simmons or anyone on the production side of the platform, to tell you how to place those lanyards, right? A. No, sir.
Page 155: Q. Furthermore, nobody told you -- Jason Simmons did not tell you: Don't put your lanyard in any particular location. Right? A. Right. Q. And the production hands on the platform, they likewise did not say: Mr. Padgett, don't put your lanyard at that location. Right?
Page 156: A. No. I didn't see them around there.
Page 158: Q. Okay. So what did you do to ensure, besides just looking at it, that it could hold your weight? A. That's all I -- I just looked at it and inspected it. I mean, the size pipe, that's all I went by.
Page 171: Q. Mr. Padgett, I'd like to direct your attention to the day of your accident before you started climbing up the stack, and direct your attention to the series of conversations where your crew asked for scaffolding and Mr. Simmons said we're not going to get scaffolding, and whatever else he said. In that give-and-take, did your boss, Chicago, execute Stop Work Authority? A. No, sir.
Page 172: Q. Did your immediate boss, Jason Pierre, execute Stop Work Authority? A. No, sir. Q. Did either Rodney or Chris execute Stop Work Authority? A. No, sir. Q. Do you know why that is? A. Yeah, because you pretty much wouldn't come back to work after that.
Page 172: Q. Was it the understanding of your crew that if they executed Stop Work Authority, they would not be allowed back to work? A. Pretty much, yes, sir.

**MR. BRYAN MOLAISON TESTIFIED AS FOLLOWS:**
Page 3: Q A Q A And by whom are you presently Fieldwood Energy. What is your position? HSE Coordinator. employed?
Page 18: (EXHIBIT NO. 1 MARKED FOR IDENTIFICATION)
Page 18: Q I would like the direct your attention to Number 1, under Preliminary Findings. It says, and I'm going to quote, The work scope changed. What was it you were referring to when you made that
Page 19: preliminary finding at the time you wrote this memo ?
Page 19: A That the work scope for that particular construction crew had changed that day.
Page 19: Q Meaning, after they left Grand Isle 43-AA and went to West Delta 70-X/L, at some point they received direction for a different job; correct? A That's correct.
Page 19: Q All right. Number 2, and I'm going to quote, Crew did not have the necessary equipment (scaffolding) to complete the job safely. What were you referencing when you made that preliminary finding in Exhibit Number 1? A Well, and that's a — again, that's one of the ones X told you yesterday -- Q Yes, sir. A — that — that I don't agree with today.

Page 20: A Well, and again, I — as I stated yesterday, I don't agree with this —
Page 21: Q I acknowledge it. You have a question. A -- because -- because they did have the necessary equipment to do the job safely.
Page 21: Q Was it that the job, to be safely done, the drain repair project required the use of scaffolding? A Absolutely not.
Page 21: Q Number 3, Discussion from production personnel was misinterpreted by the consultant that they were to quickly perform the newly identified work. What was your thinking that led to that preliminary finding?
Page 22: A Right. That the message from the field foreman to the consultant was perceived that they wanted it done quickly.
Page 23: Q Yes, sir. Was your thinking, you wrote Number 4, at the time that standing on piping created a hazard for the work to be
Page 23: performed ?
Page 24: A No, sir.
Page 24: Q A Q A Q All right. Was it your — Because people stand on piping to do work all the time in this industry — Was it — and Was it - - they don't get hurt. your thinking that there was a safer way to do the job rather than standing on piping, 4 ? when you wrote Number
Page 24: A No, I think Number 4, again, deals no one using stop work authority.
Page 24: Q Thank you. Failed company policies — Company Policies Failed: or, Number 5,Consultant or PIC did not properly
Page 25: evaluate the elevated work hazards, qualify the level of risk of the job, and establish the required safeguards. What was your thinking that led you to that statement under, Company Policies Failed?
Page 25: A And, again, I don't agree with this one, because they did properly evaluate the elevated work hazards, because they — they went all -- through all the pre-job planning that was necessary, the JSAs and the working at heights. And so I disagree with that statement.
Page 27: Q All right. The initial anchor point - - Number 7 — could not support 5,000 pounds. Is that a concept of after-the-fact we learned that it couldn't do it because it fell, or, is it the concept that four-inch drain pipe can't support 5,000 pounds? It's one or the other? Which one was it in your thinking? A No, it's —
Page 27: A It's the concept that drain pipe that you know that needs to be repaired or replaced, the very pipe that you're there to work on, you should not use that as an anchor point.
Page 28: Q And your view is Mr. Padgett and his crew and his supervisor should have known that? A Yes . Q Your view is that Mr. Simmons should have known that also? A I mean, I would -- yeah, I would think. But he's the one that's doing the tying off to, and with his knowledge and experience and training, he should have identified that.
Page 29: Q As the job was walked down by Mr. Simmons, as they say, wouldn't one of the steps in walking down the job have been to point out to the crew: If we're going to use a lanyard and if we're going to climb this pipe, y1 all should not attach to the drain pipe that you're working on, because it's a potential hazard? Isn't that his responsibility as the consultant to make a hazard analysis prior to the job occurring, in pre-job planning?
Page 29: Q I s n 1 t it his responsibility?
Page 30: A It's everyone's responsibility.
Page 30: Q Does that mean, yes, it is Mr. Simmons' responsibility, as well as others? A Everyone, yes.

Page 30: Q Thank you. Number 8, The Consultant or PIC did not perform a proper Hazard Analysis which would have identified the possibility or potential of a fall. What was your thinking when you made that statement under, Company Policies Failed? A I don't know what my thinking was a year and a half ago; but, when I read it today, I realize that that's inaccurate. Because, again, I keep going back to the JSAs that all personnel involved in that crew went through —
Page 30: Q Okay. A — and all the — and the Working From Heights checklist, they — they didn't miss a thing when they did their pre-job planning.
Page 31: (EXHIBIT NO. 2 MARKED FOR IDENTIFICATION)
Page 32: A It is a agenda for a, uh, PIC SEMS Conference Call.
Page 33: Q Okay. So, these principles of Preliminary Findings and the Company Failed Policies
Page 34: that you included in the preliminary information, you had a conference call, sent this piece of information out to everybody, and actually talked about it and said these are the findings that we made, these are the mistakes that the company made, and we need to learn from this -- in a -- in a general way; correct?
Page 34: Q Isn't that correct? A I agree with part of that, but not all of i t .
Page 38: (EXHIBIT NO. 3 MARKED FOR IDENTIFICATION)
Page 39: Q This Incident Report filed with the Federal Government tracks the wording of your preliminary incident -- Preliminary Information From Fall Incident, Document Number 1; did it not?
Page 39: Q It has a section for, Consultant didn't properly evaluate elevated work hazard; Stop Work; Initial Anchor Points. I mean, if you want to read it — A No, it's — Q — and compare it? A Yeah, it's very comparable, yes, sir, a lot of the same information.
Page 50: Q So, how — how — can you conceive of a way that he could get his job done by just standing on that pipe? A (Witness has no response.)
Page 53: Q I'm going to suggest to you, I'm going to ask if you can disagree with me; there's no way, in
Page 445, that fitter could stand on this pipe and reach this busted area over here in the top right corner?
Page 53: Q It's six or seven-feet away, he can't reach that far?
Page 53: Q Any idea how he could have done it?
Page 53: A They're the experts, sir. We hired them to do that type of work.
Page 55: Q Doesn't Mr. Simmons, as the consultant, have responsibilities in addition to the Fluid Crane crew in pre-job planning?
Page 55: A It states that —
Page 55: A It Fieldwood i s the policy of Foreman for Production Foreman, Field its Charge, Lead Person Operator, o r I n Consultant to be responsible for: Identifying hazards and risks of the workplace and provide information to all affected personnel; Eliminate, control, and/or minimize hazards in the workplace.
Page 61: Q Was there anyone in — on that vessel — on that platform, at that safety meeting, in a better position to identify any safety hazards other than Chicago or his crew? A No, sir.

**MR. GREGORY SOILEAU TESTIFIED AS FOLLOWS:**
Page 6: Q A Have you worked for a company called Fieldwood Energy in the past? Yes .
Page 7: Q I am told that you held the position of field foreman in October of 2017; is that right? A Yes.
Page 20: A We, as Fieldwood employees, safety first. always put

Page 20: Q And if — you would be obligated to choose
Page 20: the safest way —
Page 21: Q -- is that the right way to say it?
Page 21: A We chose the safest way at that, yes.
Page 23: A Blaine Marcantel.
Page 23: A Area Production Foreman.
Page 23: Q Above Mr. Marcantel, who would have been in the line of authority over you and
Page 23: 4 3-AA?
Page 23: A Richard Dunham.
Page 23: Q A What was his position? Production Superintendent.
Page 23: Q And going down, you in 43-AA ? below you, who reported to
Page 23: A Q A Q A Michael Stevens. What was his position? Hmm, 43 Field PIC. What does PIC stand for? Person In Charge.
Page 27: There's a gentleman whose name has come Q up, Clint Broussard, who I understand to be a construction foreman. Do you — did you know Mr. Broussard in that time period? Yes. A
Page 28: Q You did not have direct authority over that construction crew? A Correct.
Page 30: Q All right. The line of authority for the construction crew would have been from Mr. Simmons up to Mr. Broussard, as you remember it?
Page 32: Q What did Mr. Stevens tell you about the results of the inspection? A I recall that, according to Michael Stevens, Randal noticed quite a bit of water pouring out from some of the drain — deck drain systems. Excuse me.
Page 34: A The platform was already shut in, had not returned to production since the shut-in for the storm: You — we would not bring the facility on line until the repair is complete, as regulations.
Page 34: A The wording I got from Michael did state that the leak was from the underside of the top deck.
Page 35: Q Well, what was the next step you took after receiving the information from
Page 36: Mr. Stevens that there were leaks in the drain line from the underside of the top deck? A I told Michael to find out where the construction crew was at, at that point in time, that we would need to get them there to make repairs.
Page 37: Q Okay. A All I needed to do was find out where the construction crew was at, at that time; get the boat going that direction. And then I made a phone call to my boss, Blaine Marcantel. Q So, Stevens, the instruction is, Find out where they are and get the boat moving toward that location? A That is correct.
Page 37: Q While I then make some phone calls? A That is correct. Q Do you remember where they ere, from Mr. Stevens' information that came back to you, where the construction crew was when this was going on? A Yes. Q Where were they?
Page 38: A Midway between West Delta 70-I&L and West Delta 95-S&X.
Page 38: Q Was it your understanding that Mr. Stevens would give the instruction to the crew and the boat to change course and go to 7 0-Dog? A (Witness has no response.) Q Or was he just to find out where they were? A No, Michael was to let -- to tell them that they needed to change direction to 70, which, he passed that information on to the boat captain. Q Who did you call? A Blaine Marcantel.
Page 38: Q Tell me the substance of what you told him? A That we were rerouting the construction crew from doing work at 95-S&X, rerouting them toward 70-D because of the drain system. Q What did Mr. Marcantel tell you? A There was a period we were on the phone. . Hmm, I can't recall how soon the phone call was made. I do know that he was able

Page 39: to speak with Clint Broussard, and, that Blaine did agree with my decision to change direction.
Page 40: Q If Mr. Simmons were to testify that you told him, We've got to get this done. Go, go, go, would you dispute that? A I would. Q You have no memory of a conversation like that? A Definitely not , Go, go, go.
Page 41: A If it were me to have the conversation with Jason Simmons, I would tell Jason that the 70-D repairs take priority over the 95-S&X repairs.
Page 41: Q All right. What else would you have told him? A If I were to talk to him, I would say, Contact Clint Broussard for instructions .
Page 45: A Mr. Simmons takes all the information he
Page 45: n
Page 45: needs once he scopes the work.
Page 48: Q Everybody's standing on the top deck Um-hum ( ye s) . A they've been off-loaded from the boat, Q and only Randal knows where the work is. You tell me how you believe the construction crew found out where they were to go?
Page 48: Randal met with the people and informed A them of the leak.
Page 66: Q All right. Did you give Mr. Molaison any information for the report?
Page 67: A Not that I recall.
Page 67: I'm going to identify the report as Exhibit Number 1. (EXHIBIT NO. 1 MARKED FOR IDENTIFICATION)
Page 67: Q And I'm going to hand it back to you. There is a summary of the incident, is that consistent with the -- on the first
Page — is that consistent with the information you knew or had gained about how the accident happened?
Page 67: A This is the information that was information given from Jason, hmm, during the meeting in the doghouse.
Page 68: Q All right.
Page 2, Fieldwood Document Number 7, the first Finding, The four-inch drain piping repair work was added to the construction crew's workload for the day after they were already on the boat after the morning safety meeting. Is that consistent with your knowledge of what happened?
Page 69: A Correct.
Page 69: Q Consultant perceived that the PIC wanted him to hurry. Did you hear that during any of your conversations during the
Page 69: i
Page 69: Q -- that statement being made Simmons or anyone else? by Mr.
Page 69: A We, hmm — first off, I've never pushed anyone to hurry on something like that.
Page 70: A The -- in the 70-D doghouse, he was asked — he, being Jason, was asked if he felt like he was hurried. And his answer was, Yes, I felt like I was hurried. Not that anyone told him to hurry, that he felt like he was hurried.
Page 72: Q Let's go to the next finding, third line. Consultant stated no one told him to hurry. Did you hear that during your investigation?
Page 73: I did hear it. A I do remember that.

Page 74: Q After dropping the construction crew at West Delta 70-D, the boat went to West Delta 70-I/L to pick up a valve and they also loaded the scaffold equipment onto the boat. Did you gain that information during your investigation? A I did hear that part during the investigation. Q From whom? A Jason.

Page 74: Q All right. So, what we know is, to this point in the investigation, Mr. Simmons and the construction crew arrived at West Delta 70-D without scaffolding; correct? A Their arrival was out -- without scaffolding, yes. Q After the boat dropped Mr. Simmons off at West Delta 70-D, it returned to 0-I/L to pick up a valve, and also pick up the scaffolding equipment; true? A True.

Page 74: Q And we know that they're only about a mile apart; right; not far?

Page 75: A True.

Page 75: Q Next: The consultant, Mr. Simmons, walked up to the work area where the fitter was standing eight-feet above the deck, and was approximately five-feet away just before the fitter fell to the grating deck. Did you hear that information from Mr. Simmons during the investigation? A Yes.

Page 75: Q All right. The IC, Randal Mitchell, had just made a lift with the crane to remove the valve that the boat had delivered, and he was climbing down the crane ladder when he heard the drain piping hit the deck.

Page 76: Did you hear that information during your investigation?

Page 76: A Yes .

Page 76: Q All right. So, if we pull those pieces of information together, we can see that the boat had returned to West Delta 70-D with the valve and the scaffolding before the accident actually happened? A That is correct.

Page 76: Q The injured fitter was tied off to the drain pipe that they were about to repair and was repositioning to attempt to set a beamer device as his anchor point on the beam above — pardon me — yeah, as his anchor point onto the beam above when the pipe failed. Did you hear that from Mr. Simmons ? A Yes.

Page 77: Q From the deck grating — pardon me, I misspoke. From the grating deck to drain pipe that fitter was tied off on was approximately 11 feet. Do you remember that?

Page 79: Q Length of pipe — pardon me. Length of piece of drain pipe that failed from end to end was seven feet. Do you remember that measurement? A I don't remember the measurement.

Page 80: Q Skipping down, The drain pipe needed to be repaired prior to bringing the field back on line. You know that to be true? A That is correct.

Page 81: Q Okay. When scaffolding equipment is not in use, it is supposed to be stored on the field boat so they can use it when needed. (According to Blaine Marcantel and Clint Broussard). Do you remember receiving that information during the investigation? A I do not .

Page 81: Q After speaking with Ross Bonin, he stated during the meeting with the crew the following day some personnel stated that if they used stop work authority they may not be back the next hitch. Do you remember receiving that information during the investigation? A I don't remember that being said.

Page 81: Q Under Path of communication, in the second line, it says, Gregory Soileau, field foreman, contacted Jason Simmons about the change to go to West Delta 70-D. Does that jog your memory that that was the information that was developed during the investigation, that you're the one that contacted Mr. Simmons? A I don't -- I don't recall me being the

Page 82: It's document Fieldwood 201. I'm going to identify it as Exhibit Number2 . (EXHIBIT NO. 2 MARKED FOR IDENTIFICATION)

Page 83: Q Okay. Under Incident description, the second paragraph, second line, it says, The scaffold material that the crew normally used had been left on a different location from a previous task, so it was not available. That was consistent with what you learned or heard during your investigation; correct?
Page 83: A Hmm, it was left on a different location, but it was at the location on the boat
Page 84: prior to the incident.
Page 85: Q The crew did not have the necessary equipment (scaffolding) job safely. to complete the
Page 85: Q -- consistent with your investigation?
Page 85: A I personally feel that's not consistent.
Page 91: Q Okay. So, no one in the area recognized that climbing the piping on — climbing and standing on production piping to perform work was hazardous and there was a safer way to perform the job task; is that consistent with the information you developed during the investigation?
Page 92: A That's correct, hmm, I did not come to these conclusions, I was a bystander, and I didn't go to anyone and ask them if they could or could not recognize that climbing on piping, so on and so forth.
Page 94: (EXHIBIT NO. 4 MARKED FOR IDENTIFICATION)
Page 95: Q The document is titled Ultimate Work Authority Agreement Form for Simultaneous Operations. It establishes Randall Mitchell as the person with Ultimate Work Authority on West Delta 70-D on October 10, 2017; correct?
Page 96: slot
Page 96: in the his name have It -- it does A
Page 96: Q Okay. That document establishes him, Mr. Mitchell, as the last authority on the
Page 96: platform on October 10, 2017; correct?
Page 97: A Yes.
Page 97: Q Sure. The document also says Mr. Simmons has direct responsibility for the construction crew doing the drain repair project; does it not?
Page 97: A (Witness reviews document.) It does show, uh, Jason as being over the construction side of it, from what I'm reading.
Page 99: Do they have Bates stamp numbers? MR. TAULBEE: Yes. M44 is Number 5.
Page 100: (EXHIBIT NO. MR. 5 MARKED FOR IDENTIFICATION)TAULBEE: And 43 is Number 6. (EXHIBIT NO. 6 MARKED FOR IDENTIFICATION)
Page 101: Q Exhibit Number 5 has a mark on it that says Contractor was standing here. A Yes, sir.
Page 103: Q After having observed the area, is there more than one logical way to get up there?
Page 103: A According to what I remember on the incident investigation, climbed on a pig trap. it states he
Page 103: Q It's the cylindrical object that's -- that's identified as 7 1 - E and some other
Page 103: l
Page 103: A That would be, yeah, Incoming.
Page 121: Q I want to direct your attention to them specifically, all right? I've handed you a series of documents that I'm going to identify as Exhibit Number 8.
Page 121: 235.
Page 122: (EXHIBIT NO. 8 MARKED FOR IDENTIFICATION)
Page 123: A It was my — my and other Fieldwood employees to promote safety.
Page 123: Q Okay. And you did that by following the Safe Work Practices Manual, among other things? A According to their Safe Work Practices.

Page 124: Q All work is to be conducted in compliance with Fieldwood1s Safety and Environmental Management Systems and Safe Work Practices; right? A That's what t states.
Page 125: Q It's my understanding that Mr. Simmons was a consultant; is that true, he was not a Fieldwood employee? direct not a Fieldwood employee. A He was a consultant? Was he Q A yes, part of a — he was a He was of a consulting supervisor that was part firm.
Page 126: So, do I understand correctly that the Q consultant, according to these documents, was in charge of day-to-day field operations, and in Mr. Simmons' case, of a construction project? (Witness has no response.) A Is that how I'm to interpret that? Q The — correct. The Consultant, i.e., A Jason Simmons, would be in charge of the day-to-day operations of his construction project that he oversees.
Page 126: Looking at the responsibility of Scope, Q it says the consultant, among other
Page 127: people, is to ensure that the hazard control procedures are utilized in a manner which effectively prevents injuries; he's charged with that responsibility? It states that, Fieldwood Energy is responsible for the consultant to ensure that the hazard control procedures are utilized in a manner which effectively prevents injuries.
Page 127: Q Okay. And on the next
Page, under Pre-job Planning, again under Scope, among other people, the consultant is responsible for identifying hazards and risks of the workplace and providing information to all affected personnel. That's one of his duties?
Page 128: Q Were those the practices that were followed in the field, in your field? A The Scope is — it is the policy of Fieldwood Energy that its Production Foreman, Field Foreman, Persons In Charge, Lead Operators and Consultants are responsible for identifying hazards, risks in the workplace and provide information to all affected personnel.
Page 129: Q Thank you. If you'll go to
Page 254, under Fall Protection.
Page 129: Q The bottom of the
Page starts with the concept of Hazard Analysis heading. And I'm going to ask you, is this the procedure that was followed in your field: When a job task will create the possibility or potential for a fall, the Person In Charge, Lead Operator or Consultant should consider the methods in which to address fall hazards in the following order. Did the Safe Work Practices establish an order or a hierarchy of how you consider fall protection?
Page 129: A Well, I would have to agree that what you just read is in the Safety and Environmental Policy.
Page 129: Q Okay. And is that what was applied in your field for field operators, following
Page 130: this hierarchy for fall protection?
Page 130: A It does state that, hmm, when a job task will create the possibility or potential for fall, the Person In Charge, Lead Operator or Consultant should consider methods — should consider methods in which to address that fall hazards in the following order.
Page 130: Q And then the second one is try to — fall prevention may be accomplished by the use of manlifts, scaffolds, or temporary access ways; correct?
Page 131: A 11 says
Page 131: A -- Fall prevention may be accomplished by the — may be accomplished by the use of manlifts, scaffolds, or temporary access ways with standard handrails, toe boards. midrails and
Page 131: Q And the last one is fall protection by the use of a lanyard or a fall arrest system;
Page 131: correct?

Page 132: A Use of fall — Use of proper fall arrest systems such as: Full-body harness, Y lanyards, lifelines (vertical and horizontal), retractable lifelines, this equipment shall be made available to employees.

Page 134: Q And you were the highest authority on the ground on Grand Isle 43-AA for that field, for production operations; true?

Page 134: A I was the highest Fieldwood employee at Grand Isle 43-AA; not West Delta 70-Dog.

Page 134: Q In your judgment, as a seasoned and experienced field operator, which provides the safest work footing, a four or six-inch rounded pipe, or a flat surface of a scaffold?

Page 134: A The scaffold is a steadier workplace.

Page 147: Q You've got in front of you the Fieldwood Energy document entitled Ultimate Work Authority; correct? A Yes, sir. Q We've identified this as Exhibit 9? A Yes, sir. (EXHIBIT NO. 9 MARKED FOR IDENTIFICATION)

Page 155: Q Okay. In this particular case involving this repair job, you would have expected the consultant, in this case Mr. Simmons, to have planned out the job and to have taken all the necessary precautions to

Page 156: complete that job?

Page 156: Q A Correct? As far as the construction and the makeup

Page 156: of the, you know, rebuild, the demo and the if -- that would be the construction side.

Page 157: Q If you go all the way down towards the bottom of the

Page, where it says, This is just a few of the company policies failed. You see the first one says, Consultant or PIC did not properly evaluate the work hazards. In this particular case, wasn't the Consultant Mr. Simmons who didn't properly evaluate the hazard?

Page 157: A Being that it would be on the construction side, I would have to agree.

Page 159: This is Fieldwood 00193. I apologize. That was the wrong one. Work Location: Cellar deck drain lines. Okay. Out to the right-hand side, it's got PIC Initials? Yes . Whose initials are out to the right-hand side? From 1 through 10, J.S. And who would that be, if you can tell? At the bottom, it has Jason Simmons.

Page 159: Q Okay. So, for working on heights, or working from heights for this construction repair job we're here talking about today, all of those Points 1 through 10 were the responsibility of Mr. Simmons? A Mr. Simmons --

Page 160: A — has J.S. — well, there's J.S. written in the PIC Initials, 1 through 10.

Page 161: Q If you see, on the right-hand column, where it says, Company Policies to be Reinforced. The first bullet point says, quote, Consultant or PIC, along with the person performing work at heights, shall properly evaluate the elevated work hazards and establish the proper safeguards. Did I read that correctly?

Page 162: A Verbatim, yes, sir. Q All right. So, in case of the construction crew, the consultant that in charge of that job, along with the person performing the work at the height, should be the ones to evaluate the work hazards and establish the proper safeguards; correct? A That is correct.

Page 162: was

Page 163: (EXHIBIT NO. 11 MARKED FOR IDENTIFICATION)

Page 164: Q Okay. Who signed off on that JSA on the very last

Page as the Person in Charge? A It states, Person in Charge or Consultant: Jason Simmons.

Page 164: Q On the first

Page, which is 00025, up in the upper right-hand corner, it says, Designated PIC/UWA, whose names are mentioned there? A Randal Mitchell/Michael Stephens.

Page 167: Q All right. And being the field foreman or supervisor for the production side, would you have expected Mr. Mitchell to supervise this construction project on that platform?

Page 168: A Only on the behalf of the production equipment, operation. you know, on his routine

Page 172: Q Yeah, I mean, that — okay. Is that the Ultimate Work Authority Agreement Form for Simultaneous Operations for the work that we're here discussing today that was being done on 70-D? A According to what I'm seeing, hmm, it is a document from Fieldwood Energy, Ultimate Work Authority Agreement Form for Simultaneous Operations, for the site date, of 10/10/17. Q And does it list as the person with UWA as Randall Mitchell?

Page 172: A It does state on here Randall Mitchell, UWA .

Page 173: Q That would be the Ultimate Work Authority Responsibilities, the first eight; correct? A (Witness has no response.) Q Isn't there a title above it? A There is a title that states, Ultimate Work Authority Responsibilities. Q And, at he bottom, it says the Person WITH Ultimate Work Authority: Randall Mitchell; correct? A It's hard to -- very hard to see, due to the copy, but it does look that way, yes.

Page 183: Q Your involvement with the drain repair project on West Delta 70-Dog was limited to directing the boat to travel to West Delta 70-Dog; correct? A Yes, and my involvement was the deciding factor to have the boat travel to 70-Dog and get the crew to go replace the pipe.

Page 189: Q Mr. Soileau, going back to the conversation you had with Mr. Stephens when you found out that there was a leak at West Delta 70-D, there was enough urgency, in your mind, for either you or Mr. Stephens to contact the boat and redirect the construction crew from its assigned task to go to West Delta 70-D?

Page 189: A It's not necessarily a -- an urgency, hmm,it was the right path for us to take on

Page 189: scale from like one to ten. on a a

Page 189: Qior~~ was at that point in time, Hmm, that. imp o r t a n t than the handrails,-of , .

Page 189: of the production But you stepped out Q a construction crew to arena and directed s work to go to 70-D, their day'

Page 190: and you've been spending this all — spending all morning telling us, I didn't deal with construction. You didn't call and get authority from Blaine Marcantel --

Page 190: Q -- or from Mr. Broussard, you made the decision on the fly to redirect them?

Page 190: A The answer to that, yes, I did make the decision to turn the boat, but, Clint spoke with Jason about the project and determined themselves that this project did need to move forward.

Page 190: Q I'm just saying, if we're trying to decide was there some urgency conveyed in the instructions between you or Mr. Stephens

Page 191: and the consultant, the consultant knows The production guy just called and turned the boat around — Uh-huh (yes). -- there must be something up; is that

Page 191: fair way to say it?

Page 191: A It was a prioritizing.

**MR. DAVID BLAINE MARCANTEL TESTIFIED AS FOLLOWS:**

Page 8: All right. I want to back up to your Area Foreman function as Area 7 foreman, Tell me the — the people that worked Area 7 under you when you held the position?

Page 8: Q

Page 8: A The production foremen •

Page 8: M r . Soileau and Mr. Selby?
Page 11: Q A And who was the production foreman at the time of this accident? Greg Soileau.
Page 14: Q Do you know if there's a rule within your company that would allow a lanyard to be anchored to a drain pipe, or not allow an anchor — a lanyard to be anchored to a drain pipe? A It's not specified.
Page 15: practice what the in fact, Okay. Is that, Q was scaffold Area that the was in 7 , the on — be stored on supposed to b e not in use elsewhere? boat when field A Not to my knowledge.
Page 16: Q All right. How far is West Delta 70-I/L from West Delta 70-D? A Probably — distance, I don't know. Uh, I'm going to tell you a boat ride, 15 minutes, half-hour, at best. Q There's a big difference between 15 minutes and a half-hour. A Not to us.
Page 17: A Consultant perceived that the PIC wanted him to hurry. Greg Soileau is the foreman. Q Yes, sir. Yesterday Mr. Molaison amended his report to say that PIC was an incorrect typo, that it was the foreman, Mr. Soileau.
Page 25: Q Do you remember that you were shut in because of the drain pipe not functioning on West Delta 70-D —
Page 25: Q — in October 10, 2017, do you remember that independently? A Yes. The field — Q You remember — A The field was shut in.
Page 28: Q A Q Yes, sir. What is the potential hazard to a worker standing on a production pipe, since it is a curved surface? Slip
Page. It is a difficult place to work from because of the curved surface of the pipe;
Page 28: correct?
Page 29: A Okay. I — I'm going to say, because it's my statement, the diameter of the pipe. for me, it depends on
Page 30: A Q I would not have a problem standing on a piece of eight-inch in diameter pipe. But you could have that, a problem working from depending upon the work you were
Page 30: called upon to do?
Page 30: A Yes, that would be difficult.
Page 36: A I'm — I'm willing to stand on a piece of
Page 36: pipe and swing a sledge.
Page 42: Q Who would be able to order the boat to go get the scaffolding, on that platform, on that day, as you know it was constituted, West Delta 70-D? The construction crew can't order the boat around; right? A Well, they can — no, they can't order the boat around, that's a true statement. Q Who can — who can order the boat? A The PIC on the platform can get with, uh, Jason Simmons, the consultant, they can get with the PIC or the production foreman and get the boat to move whatever they need to move.
Page 43: Q Okay. I made a mistake. So, if the construction crew said we think this job is safer with scaffolding, either the PIC on the platform or the construction foreman in the field had the right to order the boat to go get the
Page 44: scaffolding and bring it back to the construction crew for use as a work surface; correct? A Or the production foreman. You said construction foreman. Q I'm sorry. A No, I'm -- I'm good, I'm just listening. Q I apologize. Mr. Soileau or Mr. Mitchell; correct? A Typically that's how it would have worked.
Page 44: Q Thanks. In general, just as general rule, is a scaffolding a safer work surface than a rounded pipe?
Page 44: A Uh, a -- a fixed platform is going to be the better of the two choices.

Page 45: Q This next bullet point says, No one recognized that climbing piping and standing on production piping to perform
Page 46: work was hazardous, and that there was a safer way to perform the job task. Do you agree with that comment? A No .
Page 46: Q Going further down, just a few of the company polices that failed, it says, first one, Consultant or PIC did not properly evaluate the elevated work hazards, qualify the level of risk of the job, and establish the required safeguards. Do you believe that was an operative problem in this accident, a failure of the company policies? A I — I don't agree with the comment, but, that's hindsight.
Page 47: Q Okay. The last bullet point says, The Consultant or PIC did not perform a proper hazard analysis which would have identified the possibility of potential of a fall. Did you agree with that finding
Page 48: at the time you read it, as regards this accident? A Okay, I'm -- again I'm going to say I can't tell you what my thought process was on that particular day. Q Okay. A I can tell you today that I don't agree with that statement either.
Page 50: Q It says, Should consider methods in which to address fall hazards in the following
Page 51: is that true? order A That's what it reads.
Page 51: Q Isn't it correct that the policy as it's applied under the terms of your company's rules, is that the PIC or consultant should consider the methods in which to address fall hazards in the following order. The first one listed is Fall Elimination, Eliminate the need to perform elevated work; correct? A That's what it reads, yes.
Page 52: Q The second one listed in the following order is Fall Prevention, stated to be, which is Fall prevention may be accomplished by use of manlifts, scaffolds, or temporary access ways with standard handrails, midrails or toe
Page 52: boards; correct?
Page 52: Q A Correct? That's what it reads.
Page 52: Q And then the third one is Fall Protection, system; true? which is using an arrest
Page 52: A That's what it reads.
Page 53: Q Is there an order in which you think they should apply? A Me, personally? Q Yes . A Yeah, think it ought to be reversed, I think t should be eliminate the possibility at all, and then secondly would be fall protection, and then fall prevention. And the reason that I would, is because of the fact that it's much easier for donning fall protection. And what I mean by easier is on the individual. And even though you would use a manlift, the scaffolding, or temporary
Page 53: access, I would want to know that fall protection was the primary source of preventing a fall.
Page 63: Q
Page 244, doesn't the policy of the company establish that the Person In Charge or the Consultant are responsible for pre-job planning in identifying hazards and risks of the workplace and providing information to all affected personnel?
Page 63: A Yes, that's what it reads.
Page 64: Q All right. So, according to the policy, Mr. Simmons, as the Consultant, or Mr. Mitchell as the Person In Charge on West Delta 70-D on October 10, had the
Page 64: to identify hazards and risks of the workplace and provide information to all affected personnel they were beginning to prepare for the drainage repair project; true? Yes.
Page 76: A Had -- had somebody raised the objection, we wouldn't be sitting here right now, chances are.

Page 77: Q And it discusses the accident of October 10, 2017, involving Mr. Padgett. I've highlighted a simple two-sentence portion at the bottom, and I'm going to read it. This is from Mr. Broussard, Construction Foreman. Also remember if we are addressing work six-feet or higher, a scaffold must be erected if any way possible. If a scaffold cannot be erected for whatever reason, I need you to call me to discuss other options. Were you aware that Mr. Broussard had this rule in place for construction activities in Area 7 in October 2017?

Page 78: Q I didn't ask if you received the email.

Page 78: A Still no. Q You are not aware of that rule? A No .

Page 78: Q Did Mr. Broussard, as the construction foreman, have the authority to impose such a rule in his Area 7 work? A No . He did not? Q A No. I'm — I'm surprised that I didn't hear something about it because of the on this people that are named on this — email.

Page 78: authority Okay. Why would he not have the Q t o imp o s e that rule as an operational rule for his — his area? A our Because it does not comp 1y with and I don' t think — I'm policy. And — surprised that on this the people that ' s email, that they would not have told him

Page 79: to retract it.

Page 81: But is there a rule or a protocol that says you shouldn't tie off to drain pipe as an anchor point for your lanyard, in your company ?

Page 81: A You asked me that already, and, no.

Page 82: I'm looking for the JSA for the day of

Page 82: the accident.

Page 82: A Okay, that's the 025?

Page 83: Q And then on — to the right of that, what does it say in that box? A The immediate supervisor of the crew performing the job outline must conduct the JSA, sign the JSA, and ensure that all personnel participating in the job understand and sign the JSA. Q And the JSA Conducted By? A Khamla, and I can't even -- I'll rape the last name. Q Do you understand that to be the contractor that was on-site to do the actual repair work? A Yes . Q Fluid Crane?

Page 83: A Yes . Q That would be the employer of Mr. Padgett, Fluid Crane? A That's what I — that's what I see.

Page 93: Q Isn't it correct that the Fieldwood Safe Work Practices place obligations on Mr. Simmons, in either or both of pre-job planning and JSAs?

Page 94: A (Witness reviews document.) Pre-job planning, identify hazard risk in the work place, provide information to all affected personnel. Q So, the answer is, yes, it does place obligations on Mr. Simmons? A It shows — it does show Person In Charge, Lead Operator, Consultant. Q And that's as regards pre-job planning? A That is pre-job planning.

Page 97: Q Thank you. The Area 7 Grand Isle 43 Field had not, at least for the platforms and facilities that fed into the West Delta 70-Dog structure, had not been returned to production after Hurricane Nate at the time that the drain pipe repair project was conceived? A Right.

Page 97: Q Okay. So, it was -- the reason why it was not brought online was because of a problem with the drains? A Yes .

**MR. RANDALL MITCHELL TESTIFIED AS FOLLOWS:**

Page 7: Q Who did you work for before that? A Before that, I worked for Wood. Q Wood Group, it's a consulting company? A Wood Operating Company. Q All right. What was your title with Operating

Company? A A Operator. Q How long were you employed by Wood as A Operator? A Hmm, nine years.

Page 8: Q I'm told you returned to the Grand Isle 43-AA field on October 9, returning from the evacuation; is that true? A Yes, sir.

Page 11: Q And your assessment was one of the steps necessary to make the determination that it was safe to bring West Delta 70-Dog back online? A Yes, hat would be the reason why we were there.

Page 16: Q Did he successfully do that something during the day on the 10th — A No, sir. Q — get the engine back up running? A No, sir,. Q Okay. Do you know why? A It wasn't dry,

Page 16: A While we were out on location, the Linear guy assessed his job, we did JSAs for his job. We had a rain storm come through. And as the rain storm came through we went down on the bottom deck and noticed they had, uh, drain pipes that were leaking, uh, pretty excessive. So, we called — called that in to our — Michael Stevens, our lead at the main facility.

Page 17: Q Other people have told me that leaking drain pipes are a problem that would have prevented you from bringing West Delta 70-D online for production purposes because of certain regulations that apply in the oil patch; is that true? A Yes, sir.

Page 17: Q Where was the drain line coated? A Over he West Delta 71-Echo incoming pig trap.

Page 18: A There was two spots that we could see where it was actually leaking really bad around where the pipe meets the trough upstairs.

Page 18: Q Okay. Where the vertical part of the drain pipe meets into the deck above you? A Yes, sir.

Page 18: Q Who did you call about that leak? A We called our lead operator, Michael Stevens, that was located at Grand Isle 4 3 .

Page 19: You were to wait for the Okay Q

Page 19: construction crew?

Page 19: A Yes,

Page 34: Q Did you unload any scaffolding? A No, sir. Q Do you know why you didn't unload any scaffolding? A The scaffolding was never brought up in any conversations. Q All right. With whom? A With Jason or the lead, that nobody ever told me to off-load any scaffolding.

Page 36: Q Okay. What did you do after you showed Mr. Simmons what he needed to repair? A We — I'm — I waited for him to tell me what they needed to get off-loaded. Q Okay. And you off-loaded whatever they told you? A Yes, sir. Q And you put it on the top deck? A Yes, sir.

Page 40: (EXHIBIT NO. 1 MARKED FOR IDENTIFICATION)

Page 41: Q Was there a standing rule in the Field 43-AA, that you knew of, requiring the scaffolding to be on the boat at all

Page 42: times?

Page 42: A No, sir.

Page 42: (EXHIBIT NO. 2 MARKED FOR IDENTIFICATION)

Page 42: Q

Page 42: And ask, is that your signature on the document that I've handed you, labeled Ultimate Work Authority? Yes, sir.

Page 43: Q Why do you initial it? A Work — ultimate work authority would still be Michael Stevens at the Grand Isle 4 3 -AA facility. Q Is Mr. Stevens on this — A No, sir. Q — document? All right. According to this document, ultimate work authority was

Page 43: in your hands on West Delta 70-D on 10/10/17; correct?

Page 43: A I still wouldn't be able to give the — the right to go back to work if a stop work was occurred, so.
Page 44: Q So, you didn't have ultimate work authority on this platform, even though you signed this document? A No, sir, we still could have got -- got a verbal from Michael Stevens for me to sign this paperwork for the agreement for Jason Simmons to hand over that day. He's in charge of his operations.
Page 44: Q Okay. As far as people on the platform, you were the highest guy on the chain? A I was the PIC, yes, sir. Q Well, you were the UWA, Ultimate Work Authority; correct?
Page 45: Q A Q Isn't that correct? I was the PIC on the facility. And you had ultimate responsibility the platform while you were there? for
Page 45: A I was the highest rank there —
Page 45: A Q -- at the time. And you had the ultimate responsibility on
Page 45: the platform that day?
Page 46: A Yes .
Page 46: Q Did you have responsibility, and I'll quote, Review planned work, safe placement of equipment and egress routes with all supervisors? A Yes, sir.
Page 46: Q In what way did you review the planned work with Mr. Simmons? A I showed him where the — the pipe -- the work needed to be done, and him and his supervisor talked it over, and, uh, what equipment they needed and everything like that. And when we did our JSA meeting, we went over all the steps. Q So, you were aware of the plan to do the drain repair project that Mr. Simmons and the Fluid Crane supervisor came up with?
Page 47: A Yes, sir. Q You approved that plan by signing off on the JSA, did you not?
Page 47: Q Did you have the responsibility on that platform that day, October 10, 2017, to make certain that Fieldwood safe work practices were complied with by all operations? A Yes, sir.
Page 48: Q I'm not talking construction. you: I'm asking It was your obligation to stop any work that did not comply with the Fieldwood Safe Work Practices manual; true?
Page 48: Q Is that true, sir?
Page 49: A Yes, sir.
Page 49: A The plan at first was not to climb.
Page 49: Q What was the plan at first? A Either he had a — they had a stand next to it or try to find additional way to get
Page 50: up there. It changed after the fact to — to be able to, uh, work from heights. The initial plan, I didn't hear anything about working from heights.
Page 50: Q Thank you. The initial plan was to use work stand -- A Yes. Q — that was located in the area — A Yes, sir. Q — as a place to stand on? A Yes, sir. Q Or, to do what, find something else? A Uh, a ladder or if they had anything available at the time.
Page 50: Q Fair enough. And, ultimately, that plan changed — A Yes. Q — to working from heights -- A Yes, sir. Q — climbing up in the piping? A Yes, sir.
Page 50: Q Did you know about the change to climbing up the piping, working at heights, before the accident happened? A Uh, Jason did come up with me, hmm, to
Page 51: sign the Working From Heights — they signed all the permits and everything, and he just let me know that they were going
Page 51: to have to set a beam clamp.

Page 51: Q Okay. So, that required, according to the Safe Work Practices manual, that a Working From Heights Form be filled out; correct? A Yes, sir.
Page 51: (EXHIBIT NO. 3 MARKED FOR IDENTIFICATION)
Page 51: Q Did you sign off on the Working From Heights permit?
Page 51: A Yes, sir.
Page 53: Q In your view it was okay to have the welder and his helper to climb up on the piping and balance on piping to do this work?
Page 53: A I'm not a -- I'm not a welder, I'm not —
Page 53: Q Did you know that they were going to climb up on piping to do this welding work? A No, sir.
Page 54: Q And, I don't -- I don't mean to be short with you, but you signed a Working From Heights Checklist; did you not? A Yes, sir. Q You knew at that time that whatever this stand, work table, whatever idea, wasn't going to work out — A Yes, sir. Q — they told you that? They told you we can't find a ladder or anything to climb up on ?
Page 54: A No, I don't recall them saying I can't find a ladder or anything like that.
Page 55: (EXHIBIT NO. 4 MARKED FOR IDENTIFICATION)
Page 55: Q First off, did you sign that JSA? A Yes, sir.
Page 55: Q Did you sign it as the person with ultimate work authority? A (Witness shakes head negatively.)
Page 55: A No, sir.
Page 55: Q Why did you sign off on this JSA?
Page 56: And what did you understand when you signed off on that JSA which says a hundred percent tie-off above six feet?
Page 57: A (Witness reviews document.) Yeah, it's working from heights, a hundred percent tie-off six feet or above,
Page 65: Q Sir, did you have an opportunity to review the Fall Protection portion of the Fieldwood Safe Work Practices? A Yes, sir. Q All right. I want to direct your attention to the
Page that I identified as Number 7 — A Uh-huh (yes). Q — it's
Page 00254. A Yes, sir. Q The portion that I asked you to read deals with Hazard Analysis for falls, does it not ? A Yes, sir. Q Does it establish a 1, 2, 3, process that
Page 66: should be followed in dealing with working
Page 66: from heights?
Page 66: A Uh, yes, sir.
Page 66: Q We can understand that. The second thing in the 1, approach is to, it says, 2, 3 and I -- let me quote it exactly, A Q Fall prevention may be accomplished by the use of manlifts, scaffolds or temporary accessways with standard handrails, mid rails, boards; Yes, sir. In the 1, correct? 2, and toe 3, that's the second one.
Page 67: Q And, in the 1, 2, 3, the third one is using fall arrest systems or lanyards; correct?
Page 67: A Yes, sir.
Page 67: Q A stand. I'm going to show you Document Number 00442, which is a photograph, which I'm going to identify as Number 8. (EXHIBIT NO. 8 MARKED FOR IDENTIFICATION)
Page 67: Q Does this photograph show the stand that was being discussed as potentially being used to stand on? A Yes, sir,

Page 76: Q Okay. All right. And just so I'm clear, you mentioned that at no time before Mr. Padgett's accident did anyone from the Fluid Crane crew mention the need for scaffolding? A No, sir, not to my knowledge.
Page 76: Q Had the Fluid Crane crew requested scaffolding to do their job, what would you have done?
Page 77: A Gotten scaffolding.

**MR. JOHN DAVIDSON TESTIFIED AS FOLLOWS:**
Page 6: Q And by whom are you employed? A I'm self-employed, Facilities Consulting Group is my company.
Page 8: A Operations Manager, Facilities Engineer, Vice President of Operations. That's about it, really.
Page 8: Q What is your educational background? A I'm a civil engineer, with a Master's degree in civil engineering.
Page 9: Q All right. What's the business of Facilities Consulting Group? A We're an engineering firm and a construction management firm, consulting firm. We work primarily in the oil and gas business, doing engineering, construction management and field services inspection work.
Page 14: Q Okay. What was the job responsibility of Mr. Simmons in his employ with Fieldwood, according to what you believe? A Mr. Simmons is to observe and report on progress on a project, to report costs, to coordinate logistics, to address problems and try to resolve them, to give broad-brush objectives on scopes of work, and to kind of make sure things are progressing as the folks in the office want.
Page 14: Q And he has a responsibility to implement
Page 15: Fieldwood's Safe Work Practices for work under his direction? A I'd have to defer you to Fieldwood to characterize their expectations of Mr. Simmons.
Page 17: Q So, under Exhibit Number 2, the preliminary information report of Fieldwood states, Consultant or PIC —
Page 18: which has been identified as your employee — did not properly evaluate elevated work hazards, qualify the level of risk of the job and establish the required safeguards. So, you never knew that before I just read it to you?
Page 18: A That's correct.
Page 48: I'm going to identify, within Exhibit Number 2 in globo, as AM, an email dated October 17, from Jeff -- October 17, 2017, from Jeff Lowe to John Davidson, and, B, some handwritten sketch.
Page 48: Q Tell me what you were asked to do? A After receipt of this? Q Yes . A So, when I called him, he asked me to take a look at the sketch and tell me what this piping system could reasonably be expected to withstand in the form of loading, and could it be considered, uh, an adequate point of tie-off, could it — can it suspend the loads that would be anticipated to arrest a fall in a tie-off
Page 49: circumstance, something like that.
Page 49: I'm going to identify it as C within Exhibit 2 in globo. (EXHIBIT NO. 2 C MARKED FOR IDENTIFICATION)
Page 49: Q I have a question. That email says in part, Short answer is this: The piping system you described would not pass — (in bold) -- all of the hurdles and safety factors required for structural design. What are the hurdles and safety factors required for structural design that you
Page 50: are referring to?

Page 50: A So, when we design, uh, a steel system under static loading stresses or dynamic loading stresses we have safety factors that -- industry-accepted safety factors that we tend to follow, and when we look at the allowable stresses in a pipe system, or in any structure, we tend to — we'll subject those systems to the loadings that we anticipate, and determine what those stresses are, and we find if those stresses are acceptable from what we call an allowable stress standpoint.
Page 54: Q Your letter says, The piping system you described would not pass all of the hurdles and safety factors required for structural design. A Right, and that's not necessarily a BSEE standard that I'm suggesting there. I'm Is it an API standard? Q It's a civil engineering standard. A
Page 54: Fair enough. So, this drain pipe system Q does not pass the structural design standards of a civil engineer?
Page 64: Q Okay. What would you need to do in order to perform that analysis? A I would need to refresh my memory on the BSEE regulations and requirements. I would need someone to show me that a drain piping system can be considered a structure, because, to my knowledge, it's not.
Page 64: Q Okay. Give me some examples of what you consider from a civil engineering perspective to be a structure? A Structures are typically different metal components than pipe, but not always. You know, like, offshore platforms are made of
Page 65: large pipe. So, uh, but structures are intended to carry gravity loads and environmental loads, whereas piping is intended to carry fluid --
Page 65: Q Uh-huh (yes). A — uh, of, uh, you know, no — no significant loading other than perhaps pressure, some internal pressure, which is irrespective of gravity.
Page 68: Q Correct. kay. What if there were two fixtures at the top that were not connected, and I want you to make that assumption, I think it only flows that if one point of contact is missing and it can't hold 5,000 pounds, then it necessarily follows that if two points of contact at the top are missing, it's still not going to hold 5,000 pounds; is that accurate? A I think that's accurate, yes.
Page 74: Q Okay. But that's basically your stock in trade, is to do your highly competent employees and consultants and provide them to your customers? A Yes.
Page 78: Q All right. The parts of the safety manual that have been produced, the Scaffolding and the other stuff, did you — did your company have someone that put this together, or was there a third party who put this together for you? A Uh, we had a company employee, who, through the course of his engagement with the company, became a independent contractor, but he assembled and collected our policy, our guidelines, on these topics and others.
Page 78: Q Sure and what's that person's name? A Sans Broussard.

**MR. WILLIS JASON SIMMONS TESTIFIED AS FOLLOWS:**
Page 9: A Q Facilities Consulting Group. What was your job for Facilities Consulting Group
Page 9: while you were employed by them?
Page 10: Q I've seen it referred to as a construction consultant. Is that the way to say it? A Yeah. More or less, yes, sir.
Page 13: Q So is it fair to say that for that nine, ten or eleven years you were familiar with the procedures and operations of Fieldwood as they applied to your construction work? A Yes. Q Did you have any part in the time period that you worked in the various companies for Fieldwood in giving Fieldwood any input on their safety policies or procedures? A Yes.

Page 14: All right. Were you familiar, during your period Q of time, those ten or eleven years that you worked on platforms, with the Safe Work Practices document? Fieldwood Was I familiar? Yes, sir. A
Page 15: Q The responsibility to apply the Fieldwood Safe Work Practices manual applied to you as the individual, when you were on their platform performing work as a construction consultant for any of these employers that you've listed. Correct? A Correct.
Page 18: Q You were functioning in that period of time, after Nate, as a construction consultant employed by Facilities working for Fieldwood were you not? A That's correct. Q You were supervising, amongst other things, a Fluid Crane crew in construction activities were you not?
Page 19: A To oversee? Yes . Q A Yes .
Page 19: Q Just oversee how they do their work and order of A work, safety of work, so on and so forth.
Page 21: Q Sure. If there's a safer way— If you have three
Page 22: alternatives to do a job, and there's a safer way, the philosophy of Facilities would say We're to pick the safest one every time. A We don't want to hurt people? Correct.
Page 22: Q You took from their Safe Work Practices that if there's choices as to how a job is to be done you're to pick the safest one every time, because you don't want to hurt
Page 22: people?
Page 22: Q Is that true?
Page 22: A Yes .
Page 26: Q Okay. Fair enough. All right. What did United Fire and Safety do? What was their job going on in this time period right before Nate and right after Nate? A Fire watch.
Page 26: Q Diverse Scaffolding, what did they do? A Erect scaffolding.
Page 27: Q Okay. I don't want to make light of it but your entourage that you went around in this field included Fluid Crane, United Fire for fire watch and Diverse Scaffolding for scaffold erection? A Yes.
Page 28: Q All right. In your vernacular, if you say I'm going to oversee somebody and I'm going to supervise somebody, is it the same thing? A To a context, yes.
Page 29: Q Well, let's go from you up. Who was above you that gave you orders on what to do? A If I remember his name correctly it was the field foreman, Greg--Gregory Soileau I think. Q All right. There was a gentleman, Gregory Soileau, that was a field foreman-- A Field foreman.
Page 29: Q --which I think is production oriented stuff. And there was a Clint Broussard who was a construction foreman?
Page 30: A That's correct.
Page 31: All right. Sir, I've got a Fieldwood Energy Daily Q LOE Construction Report document 33 and 34 that's dated Supervisor on there is shown as Jason Simmons. 10/10/17
Page 32: I'm assuming that's supervisor in your terminology. I'm going to hand it to you. I'm going to ask you to take a moment to familiarize yourself.
Page 33: Q All right. You then boarded, after a period of time, the motor vessel Dry Tortugas and traveled to West Delta 70I/L. Correct? A Correct. Q With the Fluid Crane construction rew? A Yes. Q The Diverse Scaffolding Solutions scaffolding crew? A Yes. Q And the United Fire and Safety fire watch crew? A Correct. Q What was the work that was to be done on West Delta 70I/L according to these documents? A It looks like to replace compressor bellows and grating and handrails.
Page 35: Q Okay. Now as a guy in charge, when Diverse Solutions shows up to get on to the Dry Tortugas wouldn't you have made sure, Oh, yeah. I see there's scaffolding over there. They're good to go. Wouldn't that have been part of your responsibility as the supervisor? A Yes.

Page 36: Q Okay. What were you to do at 70I/L? A Honestly I don't remember. Q Fair enough. The third line says The construction personnel began rolling back their equipment back to the tool house to load out for West Delta 95S and X. Do you see that? A Uh-huh (yes).

Page 37: The next line says Completing back loading Q equipment and construction personnel boarded the vessel. The PIC from Grand Isle 43AA called and informed Jason Simmons to travel to West Delta 70D to repair broken drain lines. Did you write that? A Yes, sir.

Page 37: Who called you? Who was the PIC that called you? Q I want to say, at that time, and I know I'm correct A this, was Michael Stephens PIC is a term of art for, at least Fieldwood, Q charge? person in A Correct. Michael Stephens was employed by whom? Q Fieldwood. A What was his position with Fieldwood? Q A PIC.

**MR. RODNEY FREDERICK TESTIFIED AS FOLLOWS:**

Page 7: A I work for Fluid Crane. I — I'm a rigger.

Page 12: Q All right. In other words, Mr. Simmons had been the company man out there for the entire time that you were working up until the accident? A Right.

Page 12: Q All right. Do you have an opinion about Mr. Simmons? A Uh — he's kind of hard to work for. Q And why is that? A Just some of the things he do, not safe.

Page 12: Q Like what? A It's just — doing that four (4) inch pipe we was supposed to repair — Q Uh-huh (yes).

Page 13: A — should have been scaffold. But it wasn't.

Page 14: Q A And do you remember that on the scaffolding crew? Yeah. boat with you was a

Page 15: Q Do you know whether or not the scaffolding was on the boat? A No. Q No, it wasn't? Or no, you don't remember? A It wasn't on the boat. It was — I think it was at another platform.

Page 16: Q What needed to be repaired? Right. And needed scaffold. They didn't have none. nstead of waiting on the scaffold to get back, he wanted Rick to go and take some measurements. Were you there I was —— conversation? Right. in that — So Rick and Jason Simmons were walking through the scope of work together? Right. Where was Chicago? Chicago and everybody else was on top, looking at something else, I guess. I don't — but it was

Page 17: three (3) of us; me, Rick and Richard — I mean, me, Rick and — Jason Simmons. — Jason Simmons.

Page 18: Exhibit Number 2.

Page 18: It's a job safety analysis — JSA, dated 10/10/17, the day of the accident. Chicago. It was conducted by And it says it's for the repair skillet drain line.

Page 19: Q And it talks about working from heights over six (6) feet using fall — a hundred percent (100%) tie off. Is that — A Right. Yes, sir. Q Okay. So that was discussed in that JSA as to how y'all were going to proceed and access the job; correct? i A Yes, sir.

Page 19: Q All right. Here's a second job safety analysis — JSA, Exhibit Number 3, that was conducted on the same day. And that's for repair of the drain line, correct, on the cellar deck? A Yes, sir.

Page 20: Q Did your job duty reguire you to use fall protection on this particular job? A Yes, sir.

Page 21: Q It did? you were safe? A That was Okay. Did you consider that the job that going to do, using fall protection was the only thing we had at the time. didn't think it was safe what Rick had to do. 'Cause I had — No, I I was going up there to help him pull measurements. But I didn't make it.

Page 24: Q You said you couldn't pull the measurements using scaffolding? Or you couldn't pull the measurements using fall protection? A No, using scaffold — you needed scaffold to pull measurements.
Page 25: Q Okay. That's all I want to know, if you disagree or not disagree. Okay. What did Rick say and who did he say it to that he wanted scaffolding? A He didn't — he didn't say it. Jason Simmons wanted measurements. I was there, Rick was there, and Jason was there. Everybody else was on top. Q Where was Jason Pierre? A On top somewhere.
Page 26: Q Okay. Do you recall if anybody complained or objected to not having scaffolding during the JSA? A I want to say Chicago had said something about needed scaffold for this job.
Page 27: Q Okay. Why didn't Chicago get scaffolding, if he thought it was necessary? A Well he called the boat. So said the boat was running the field, was gonna be a little while for the — to get the scaffold. So Jason told Rick take some measurements without the scaffold.
Page 28: Q Right. But you saw the duct tape before y'all started the job; right? A Right. Q You could tell it was uct tape? A Yeah. Q Okay. A Like they had a ittle hole; they was trying to stop a leak.
Page 29: Q Do you know if Jason saw him tie off to that? A Jason was like ten (10) feet from Rick. Q Do you know what he was doing? A Sitting there watching.
Page 29: Q Do you know whether or not he was seeing, watching what he was doing — Do you know whether or not
Page 30: Jason saw him tie off? A Oh, I'm sure; yeah.
Page 30: Q Why were you going to do that? A 'Cause I was — that's what we was told to do — to
Page 31: Q A go up, take the measurements. stop. Why didn't you? At that time, you couldn't. I wanted to call all You used all stop,
Page 31: guess what; you ain't coming back.
Page 38: Q Okay. Would you read that statement to us, please. A Working on the side. My back was turned when I — falling down when — he fell down on the deck. Pipe broke. I'm sorry. Q That's okay. Take your time. A Working on the side. My back was turned when he fell down on deck. Pipe broke. He tied off on the pipe and the pipe broke. He was in pain. His head and arm, shoulder. Q And then you signed it. Your name is at the bottom? A Right.
Page 39: Q Why don't you read that one to us. A Okay. (Quoted as read) The whole group — we got to the platform. Rick and Jason Simmons were reviewing the four (4) inch drain line. Needed replacing. There was no scaffold for the job. But Jason did not want — want to wait for the boat. He wanted Rick to take some measurements of the — the bad pipe. Jason told Rick get up in the pipe rack, take measurements. When he tried to get situated to the measurement, the pipe — that's when the pipe broke and fell with Rick tied off to it. And I put on the bottom, (quoted as read) I
Page 40: was going to help. But as putting on my harness, I heard this boom. The pipe fell. Jason was about ten (10) feet from where Rick fell. Everything as it happen.
Page 40: Q Okay. So if Chicago testified today that scaffolding was talked about and would be there if cutting pipe, but since they weren't cutting pipe that day there was no need for the scaffolding, you would disagree with that? A Yeah, I disagree.
Page 40: Q Okay. And when Jason Pierre testified that there was no discussions regarding scaffolding — the need for scaffolding during this particular job, during the JSA's, you would disagree with that? A I —
Page 41: A — disagree.

Page 41: Q So you would disagree that a discussion was had between the construction group and Jason Simmons without Chicago there at the time Rick was going up about using scaffold? A No, it was just the three (3) of us.

Page 47: A Yes, I did. And like I said, I heard rumors, you know, anybody use all stop around Jason, you gonna get runned (sic) off.

**MR. JASON PIERRE TESTIFIED AS FOLLOWS:**

Page 14: Q All right. So tell me, how does it work between the fitter -- in this case, Mr. Padgett -- and the welder, yourself? How do they work together? A The fitter do his part of the job, like clean up the work. And I'm up there helping him tack it, and I do my job welding it.

Page 20: Q Do you recall who was on board the boat that brought you to West Delta 70-D, besides your construction crew and Jason Simmons? A Two (2) caffold builders and the caffold material. Q You recall the caffold aterial being there? A Yes.

Page 20: Q In fact, I think you had a afety — a JSA while on the boat? A Yes.

Page 21: Q A Okay. The JSA that we're talking about — is that the one done on the boat? I think it was done on West Delta Dog.

Page 21: Q A And what was decided Repair drain line.

Page 21: that needed to be done?

Page 22: Q Is there a discussion as to whether or not we're going to use scaffolding, or fall protection, or something else to assess — to be able to have access to the work? A We talked about it, but that got stopped. Q So that's discussed in the scope of work? A Yes.

Page 23: Q And I understand from Chicago that it was decided that for the work that needed to be done that day, chipping and assessing the work, that fall protection was sufficient. A Yes. Q And that tomorrow — the next day, y'all were going to return to do the heavy work on the repair? A Yes. Q And at that point in time, scaffolding would be used? A It should have been used before.

Page 23: Q Okay. But was it the understanding at that meeting that fall protection would be used on the first day to do the assessment, and that the next day when the heavy work was going to be done, scaffolding would be used? A I don't recall that part at all.

Page 23: Q Okay. A Because scaffolding should have been used in the beginning. Q Did you express that opinion that scaffolding should have been used in — A Yes.

Page 25: A Like I said, I think the scaffold should have been used first, with the safety harness, to get to the pipe.

Page 25: Q Did you express your opinion that on that first day, scaffolding should be used?

Page 26: A Yes, I did.

Page 26: Q Who did you express it to? A The whole crew, and Jason Simmons, and Chicago.

Page 26: Q And what did you tell them? A We need scaffold built for we can work on that pipe. Q And what did they tell you? A Jason Simmons said no; just hurry up and do it. Q And what did Chicago say? A Chicago was upstairs at that time.

Page 27: Q All right. And you've testified today, I believe, that after Chicago left the area and y'all started the work, you expressed your opinion that we needed — y'all needed scaffolding to do that work? A Yes. Q Did you address that with Chicago at any time? A Jason Simmons was down there. We address that to him. But he just told us to hurry up and do it. Q Okay. So does that mean that you did not address that with Chicago? A No. Q You did not? A No.

Page 27: Q Only Jason Simmons? A Yes.
Page 27: Q And was that before or after Mr. Padgett went up? A Before.
Page 28: Q Okay. And why did you need scaffolding to do the job? A 'Cause we not supposed to be working on processing pipe.
Page 29: Q Did you know before he went up where he was likely to tie off to? A Yes. Q Did that nclude the usted pipe that y'all were going to repair? A That's the only spot he had to tie off to.
Page 29: Q (By Mr. Mahtook) Can you tell us one way or the
Page 30: other whether you — A Yeah, Jason Simmons was on the deck. Q At the time he — A Because Mr. — when Mr. Richard fell, he fell right by me and Jason.
Page 30: A Jason Simmons was at the location when Mr. Richard began the work. Q What was he doing there?
Page 31: Q (By Mr. Mahtook) The person who we've been talking about, Jason Simmons — what was he — A Was just watching. Q All right. And he was watching y'all conduct your activities; correct? A Yes.
Page 32: Q How close to the duct tape did he attach his lanyard? A He was five (5), six (6) feet away, I guess. Q He attached his lanyard to the very pipe that he was going to repair; correct? A Yes.
Page 33: Q That was after an ssessment was done as to how he was going to get up the pipe? A Yes. Q Because you've got to do that efore you begin to climb? A Well he was climbing up to put a — what you call — a beamer. And when he hooked up the beamer to take his lanyard off, that's when the pipe fell. Q When he hooked up the beamer to take his lanyard off of the rusted pipe that he was going to repair?
Page 34: A Yes.
Page 34: Q Do you know why Mr. Padgett didn't use stop work
Page 35: authority? A Everybody feared their job.
Page 36: Q You know, like for example, did he say, Jason, man I don't want to have to go up here without scaffolding? A We was all together discussing that we didn't want to go up there. Q Is that including Chicago? A No.
Page 36: Q During the job safety analysis that y'all did — the JSA to perform this work, did anyone suggest at the time that scaffolding needed to be used? A Not at that time. 'Cause you got to go look at the job scope, then we discuss that we needed
Page 37: scaffolding.
Page 42: Q Okay. How are you trained to determine what to tie off to? What do they do when you get certified — A You got to go to classes, you know. Q Yeah. A Fluid Crane give, I think, like a four (4) day classes. You get certify on rigging — all kind of stuff.
Page 43: Q But what do they tell you about choosing where you need to tie off to? A Tie off to a good anchor point. Q How do you determine what a good anchor point is? Do they teach you that? A Not really.
Page 43: Q How do you determine when it's — you know when something is secure or not? A 'Cause you always got good places to tie off to. But that particular day, we did not. Q What do you do then? A (No response.)
Page 43: Q What does a grown man do offshore when he cannot
Page 44: find a secure place to tie off to? A That time there, we didn't have a ladder. So we couldn't climb the ladder to get a beamer — to put the beamer on. And they did not want to build a scaffold. So he did what he could.

Page 44: Q Okay. So he tied off where he shouldn't have off? A That's the only place he had to tie off to. Q Did you see where he was tying off to — A Yes. Q — before he fell? A Yes. Q Did you warn him of any problems? A No.
Page 44: Q Why not? A That's the only place he had to tie off to. And —
Page 44: Q Is there a reason why you didn't — You saw where he was tying off to. Why didn't you say, Hey, are you sure you want to tie off there, or Don't tie off there? A No, I didn't say nothing about that. But you being pressured to do a job and being rushed.
Page 45: Q Why were you being rushed? A Jason Simmons. Q But why? A I don't know that answer why.
Page 46: Q When you were observing that, was Mr. immons in the same area? A Yes.
Page 46: Q Is there any reason that you saw that would have prevented Mr. Simmons from seeing Mr. Padgett tie off on the pipe just like you did? A No.
Page 47: Q (By Mr. Taulbee) When you say the pipe that going to be repaired was the only place that he could tie off to or hook onto, what do you mean by that? A He was climbing up. He was climbing up to put a beamer. And so he tied off on the pipe that was supposed to be repaired. And when he reached over to put the beamer on, I don't know if he bumped the pipe or what. But that pipe came down.
Page 47: Q As you saw it, did Mr. Padgett have any other options to tie onto any other point, anchor or pipe,
Page 48: other than A I don't — Q — the drain pipe to be repaired?
Page 48: A No, sir.
Page 49: Q In your experience in working with Mr. Simmons, what type of consultant is he? How was he to work for? A Asshole.
Page 49: Q On the day of this accident, did Mr. Simmons cut a corner? A Yes, sir. Q How so?
Page 50: Q (By Mr. Taulbee) How so?
Page 50: A He want to hurry up and rush us to do that — the job assessment without building the scaffold.
Page 50: Q And I'm sorry; I can't remember. Was it your testimony that you remember the scaffolding equipment being on the boat that had taken your crew — or Simmons and y'alls crew to 70-D? A Yes. Scaffolding material was on the boat.
Page 52: Q (By Mr. Taulbee) And it's fair to say that the discussions that you, Mr. Padgett and Simmons had regarding scaffolding all occurred after the JSA's had already been completed and signed; correct? A Yes.
Page 54: Q (By Mr. Taulbee) Did you convey the pressure that you felt from Mr. Simmons and the fear of using stop work authority to Fluid Crane personnel or the safety guy, Mr. Bonin, at that meeting — the safety meeting with Fluid Crane? A Yes.
Page 55: Q What do you mean, sir? A We — I had to write this statement two (2) or three (3) times to Mr. Simmons — how can I say it — for he can be happy, I guess, with the — with the statement.
Page 55: Q All right. The statement that I handed — and you can keep it in front of you. Will you read it into the record, sir. A (Quoted as read) I, Jason Pierre, was helping Richard Padgett to set up for I can make a weld. Richard Padgett climb up the pipe and put a beamer. When he turn to position himself on the pipe and he
Page 56: fell with the pipe that he was tied off to. I tried to catch him but could not. He fell coming down like shoulder and head first.

Page 63: Q Do you recall anybody during that safety meeting on the boat discussing, hey, we shouldn't be using a halter or a lanyard; we should be using scaffolding instead? A Well we was on the boat. We wasn't on the platform yet. We didn't know the job scope.
Page 63: Q Right. And we'll get there. I'm just talking — the meeting where the JSA was — when Chicago was going over the JSA for the drain repair project. During that meeting, did anyone say, Hey, we should be using scaffolding instead of a halter and lanyard tie off during the inspection portion of that proj ect? A I don't believe nobody mentioned scaffolding.
Page 63: Q Right. During the repair portion of the project, it was understood that scaffolding would be used; correct?
Page 63: A We had mentioned it — Q (By Mr. Bercaw) Right. A — to use scaffold.
Page 67: Q So during the walk through, Chicago was there. You were there. Who else was there? A Chris Randall, Rodney Frederick, Simmons, myself. Q Was Mr. Padgett there? A Yeah. And Mr. Padgett, yeah. Q Okay. And during that time, was it discussed that Mr. Padgett would perform the inspection part of the project using a halter and lanyard? A Yes.
Page 67: Q Okay. Did anybody ever mention during the walk through that, hey, we should be using a scaffold during the inspection portion of this project? A Yes.
Page 68: Q A Q A Q A Who mentioned that? Myself. Myself and I think the rest of the crew.This is during the walk through? Yes. Okay. Yes. And we're clear about that?
Page 68: Q A When that was spoken, what did Chicago say? I think Chicago asked to get the scaffolding, and
Page 68: Jason Simmons shut him down.
Page 69: Q Right. Because Chicago just testified that at no point before Mr. Padgett's accident did anyone mention the need for scaffolding as part of the portion of the project where the pipe was going to be inspected by Mr. Padgett. Do you disagree with that? A I disagree with that one.
Page 69: Q Okay. Mr. Simmons also testified that, had anyone asked for the use of scaffolding, he would have shut down the job and retrieved the scaffolding. A That's false.
Page 76: Q So I just want to make sure. During the walk through, when the entire crew was there with Jason Simmons and with Chicago, it was discussed but it was determined that it wasn't needed for that portion of the job; — A Yes. Q — correct? Okay. But it was only when the job began did you decide or feel that you needed scaffolding? A Yes.
Page 80: Q Before this accident, were there times where scaffolding was used from the very beginning, even for the fitter to access work when working from heights above six (6) feet? A Yes. Q Is the only reason that didn't occur the day of this accident because Mr. Simmons said no? A Yes, sir. He —
Page 80: A — was rushing us.

**MR. CHRISTOPHER TODD RANDALL TESTIFIED AS FOLLOWS:**

Page 7: A I was — was there when it happened.
Page 8: Q And what do you do for luid Crane? A I'm a rigger.
Page 15: Q Correct. And Jason Simmons was the company man that y'all worked under? A Yes, sir.
Page 19: Q And you know how to use fall protection? A Yes, sir. Q You know what to clamp off to? A Yes, sir. Q Do you know how to determine if it's safe to clamp off to it? A Yes, sir. Q You're taught that, aren't you? A Yes, sir.

Page 26: Q Did you or your crew ever use stop work authority where — to your knowledge, ever use stop work authority in any of the time that you were working under Jason Simmons? A No, we was — we was scared to use stop work authority.

Page 28: Q And y'all would come back later on another day to do the work? A Or that day do the work. We just needed to go see what we — what all we was gonna need to do to do

Page 29: the job.

Page 33: Q Let me ask you this. Who was there when they did the walk through? A Me and Jason and Richard.

Page 34: Q And then, do ou recall whether or not anyone discussed using scaffolding to do the inspection part of the job? A Yeah.

Page 35: Q Who did? A Jason Simmons and — Jason Simmons and me and Richard discussed — asked about the scaffolding on the boat. And he said, Well we'll see if we need it or not. And they never — he fell before.

Page 35: So it was one of them type deals where, you know, we didn't think it was no harm in it. And then Richard tied off to the drain line by the — Where it was broke over here is what we were looking at. We're not looking at it back here. Okay. So when he tied off to the drain line — right here's the pipe that he tied off to the piece that

Page 36: This is where it's attached, so this is where hooked his harness. Which I would have done and hooked it — I'd have did the same thing. Because it looks like it's tied in and you not gonna — it's not gonna — no harm in it. Well when he went to pull his self up, and soon as he set down on the pipe where — back here broke loose too. And the whole pipe come fell — fell down.

Page 36: Q All right. So when you and Richard were looking at the job that y'all were getting ready to do, it was decided where he was going to tie off to? A Right. It looked — Q And somebody just didn't notice, away from that area, that the pipe was broken or needed — corroded or needed repair? A You couldn't tell it was broken

Page 37: Q Did you, together with Richard, decide or check out where he was going to tie off to? A We looked up there. It looked safe — looked safe to — to us. I mean, like I said, really and truly, it wasn't no higher than —

Page 40: Q (By Mr. Mahtook) The decision on that day for Richard to use his harness was proper in the work that he was getting ready to do; —

Page 40: Q — correct? A Well they should have scaffold built to — you know, to — If the scaffold would have been there, he wouldn't have — this wouldn't have happened.

Page 40: Q Okay. A But, I mean, 'd have robably done the same thing he done; put it that way. If it had been me, I probably would have hooked off. But Jason told him, you know, go ahead and get up there and pull the measurement. And he did. But, I mean, that -- it was — who's to say, you know, if the scaffold would have been there if he wouldn't, you know — same thing.

Page 44: A I mean, I know what happened. And like I said, I know the scaffolding was on the boat. And I don't know why we hadn't offloaded it yet. Like I said, we just got there and went up to assess the job.

Page 50: Q (By Mr. Mahtook) Would you have remembered — just strike that. Tell me what you saw. A Him -- I seen Richard climbing. I seen him hook off to the pipe. And I'm — I was over here doing something. And then when he — I just looked up. At the time I looked up, I seen a -- you know, something. I heard it. And then when he fell, he fell — Jason Simmons was standing right here, and I

was standing right here. And he fell. And Richard hit the ground, and the whole drain line fell — I mean, just like — so

Page 51: quick, I mean.

Page 52: Q So if Jason Simmons says that he walked up at the scene right before it happened, you don't have any reason to — A No, I — Q — dispute that? A — don't have — no, I don't. Because he — I mean, I don't know if he seen it. But he was in —

Page 61: Q What did rushing have to do with where he hooked off to? A I mean, I — he could have hooked off somewhere else. He could have put a fall protection yo-yo up or a beam clamp and hooked off to it. Like I said, the pipe that he hooked off to — I'd probably do — did the same thing.

Page 62: A I don't know about cut corners. But if — I mean, to get the job done — do whatever you had to do to get the job done.

Page 62: Q (By Mr. Taulbee) But in your experience, did Mr. Simmons put pressure on you to do the job and do the job quickly? A Yes.

Page 65: Q As you looked at that drain pipe from where you were, as you were in and around the area while this work is starting to be performed, did it appear to be able to support the weight of a man? A Yes. And Richard don't weigh a buck five.

Page 68: Q Okay. Mr. Padgett in his deposition referred to it as there was one section of pipe that was definitely sprung. And he would need a come-along or maybe several come-alongs to reposition it under the deck opening where the pipe came through from the drains above. A Yes, sir. That was — that was the one that was — that he was going to look — to hop up there and measure.

Page 68: Q Okay. A And I — that's the only one I seen. That's what I'm saying, though. The drain pipe that he hooked off to — it looked like it was — I mean, it's — it would have been safe to hook off to it, I thought, you know, until it fell. 'Cause you never thought it — the other ones was loose. I mean, when he hooked off to it, the whole thing fell. But

Page 69: he didn't know it had been patched up or — either, I guess, if you want to call it. It looked, I mean Q Okay. A Until it hit the — until it got on the deck, that's when we seen the duct tape on the drain behind him.

**MR. KHAMLA CHICAGO VILAYPHANH TESTIFIED AS FOLLOWS:**

Page 10: Q All right. Give me your employment. A I work for Fluid Crane Construction.

Page 10: Q In what capacity? What is your job duties? you do? What's — A I'm the --

Page 10: Q — your position? A — superintendent for the construction crew out there.

Page 11: My fitter is Morgan Vallery

Page 12: And my rigger is Rodney Frederick and

Page 12: Dwayne Jock.

Page 13: Q Are you a certified welder? A No. Q Do you have any welding experience? A Yes. Q Have you ever worked as a welder? A No. Q What did you do before you went to work for Fluid Crane as a fitter? A I was fitter.

Page 18: A It's not up to the superintendent or the fitter to determine — we can't just go there and like we're gonna do it this way. The superintendent and the company man have to come to an agreement that's — The company man is actually above me. So I can't just go in the front of him and just do what I want to do. I have to have his approval first.

Page 27: Q Have you ever been required to review the Fieldwood safe work practices in order to be certified to go offshore on a Fieldwood facility? A For Fieldwood? No.
Page 27: Q Do you recall who your crew was for that job? A Yes, sir.
Page 27: A Fitter was Richard. Q Richard Padgett? A Yes, sir. Welder was Jason Pierre. Fitter — I mean, I'm sorry, rigger was Rodney Fredericks and
Page 28: Chris Randall. company man. And then Jason Simmons was our
Page 30: Q Did you have any problems working with Jason? A Yes. Q What kind of roblems did you have? A There was a lot of times where shortcuts were taken.
Page 30: Q Shortcuts were taken; okay. Such as? A Well for this incident right here, scaffold was supposed to be there. And then we had two (2) scaffold builders on the boat that particular day. And Jason Simmons said we didn't need scaffold. So we went up to the platform, went to look at
Page 31: the job. And it was late during the day. So we weren't gonna really get in too much detail with the job that day. And then Richard went up there. He climbed up there. He had his PPE on. He had his full — his harness — safety harness on. He just tied off to the wrong pipe.
Page 31: Q Did you assess with your fitter, Mr. Padgett, the area and the work scope and how you were going to assess it, prior to him assessing it -- prior to the job beginning? A Yes, sir. Q And did y'all determine where he was going to tie off to?
Page 32: A No, sir.
Page 32: Q Okay. If you would have — You would not have approved Mr. Padgett to tie off on the very pipe he was going to repair, would you? A No, sir.
Page 34: Q And the specific job that was being analyzed was crane operations, boat load and unload? A Yes, sir.
Page 36: Q And then I understand that y'all were heading to some location, and then y'all were redirected to West Delta 70-D. Do you recall that? A Yes, sir; I o recall that.
Page 38: Q And then you go to the location. Tell me what — A Yes, sir. The three (3) of us, which is Jason and Richard — we went down to the cellar deck. We
Page 39: looked at the job. Jason pointed out some repairs that needed to be done on the four (4) inch drain line that we were there for, and then kind of talked about how far we were gonna cut and — from one end to one end, what we were gonna take out and what we were gonna repair. And then once we did that, he also showed me some different holes in another area of the drain line that needed to be repaired also. So it was just — we were there for a certain area, but then realized there was other areas that needed to be attended to.
Page 39: Q And did the areas that you looked at to see what needed to be done and attended to include working above heights? A Yes, sir.
Page 39: Q Okay. The drain line that needed to be repaired underneath the above deck or on top of you; correct? A Yes, sir. Q Did y'all discuss how you were going to assess that area to work? A Yes, sir.
Page 39: Q And what was the discussion? A We had to harness up hundred percent (100%), get up there and take a look at it, look at the holes, chip
Page 40: it to see how big the hole is, and it would determine how far we gonna cut.
Page 40: Q All right. Chicago, is your crew certified in fall protection? A Yes, sir. Q And does that mean that they not only understand or know how to inspect and use their equipment, but also when to use the equipment? A Yes, sir. Q And the proper way to use the equipment? A Yes, sir.

Page 41: Q All right. When you and Richard and Jason were assessing this job, was it ever discussed to use scaffolding? A It was discussed to use scaffolding; yes. But Jason Simmons said that we didn't need scaffold. So it was his call. He is the one above me. So he called that we didn't need any scaffold. We weren't gonna get in it too — too deep. So we got there a little late that day. So we just gonna really just, like I said, assess it, look at it, chip the hole, see how far we got to go back in order to do this job.

Page 41: Q Did anyone voice an objection to that assessment; that is, not using scaffolding and using your fall protection? A We all talked about using scaffold. We did. We did have a conversation about using scaffold. But like

Page 42: I said, being that we were there late and we weren't gonna get into it, we just gonna see how far we had to chip back, that's all we were gonna do there that particular day. 'Cause it was — you know, got there late. So if we were gonna actually cut the pipe and really get into it, we would have had scaffold there.

Page 43: Q (By Mr. Mahtook) Okay. And then when y'all came back to do the actual work, the chipping, the cutting — I mean the cutting, the welding, all the repair work, then you would have wanted scaffolding at that point in time; correct? A Yes, sir. If we would have came back and done it, we would have had scaffold.

Page 45: Q And the job being analyzed was repair skillet drain line. A Repair skillet slash drain line. Q Okay. Repair slash — A Yeah, 'cause the — Q — skillet drain line. A The repair, then skillet, and then the drain line.

Page 46: Is this the same drain line that Mr. Padgett was Q injured on, if you recall? Umm, possibly. A

Page 47: Q A Q A Q A Q Yeah, I didn't — Okay. But your crew was there. And you discuss in that job safety analysis working from heights; correct? Yes, sir. Because it's marked off; right? Yes, sir. And y'all discussed using your fall protection? Yes, sir. And you went through the fall protection procedures;

Page 47: correct?

Page 47: A Yes, sir.

Page 54: Number 3. It is Fieldwood 25.

Page 57: Q Okay. And then here under the hot work, someone — I think that's your handwriting. A Yes, sir. Q You included in there the grating and drain lines? A Yes, sir. Q That's the work that you were going to do on this particular day. And you specifically added that and discussed it; correct? A Yes, sir.

Page 59: Fieldwood 193.

Page 59: Working from Heights and/or Open

Page 59: Hole Checklist; —

Page 59: A Yes, sir.

Page 59: Q — correct? And that is your signature at the bottom? You signed off on it? A Yes, sir.

Page 59: Q And if you'll look in the top, where it lists working from heights, work on unguarded elevations six (6) feet or more above floor or grade level, the person in charge, Jason Simmons, initialed it. But

Page 60: you approved it, correct, at the bottom? A Yes, sir.

Page 60: Q It says number one (1), all practical options to eliminate the need to perform elevated work from heights have been explored. You would have — and Jason signed off on that. You would agree with that? A Yes, sir.

Page 61: Q Okay. Anchor points are capable of supporting five thousand (5000) pounds and located directly overhead of the user as possible. Is that something that y'all — that were assessed? A Yes, sir. Everybody knows that puts a harness on, what to tie off on and what not to tie off on.

Page 61: Q And I know it sounds elementary, you know. But it's just something I've got to go through with you. So as the superintendent and the supervisor of Mr. Padgett, you would agree that he knows what to tie off to?
Page 61: A Yes, sir.
Page 63: And then my welder, Jason Pierre, came up and told me that Richard fell. And Jason Simmons was
Page 64: down there at the time. And I went downstairs to see what happened, and Richard was on the ground.
Page 65: Q Okay. Did you speak with anyone after the accident? For example, did you speak to Jason Simmons? A I spoke with him to see what would happen — what happened. And from my understanding from what I was told is that when he got up there, he was up there — he was chipping. And when he went to — he was tied off to another pipe. And then he retied himself. And when he shifted his body and the pipe — it came down. Q He tied himself off to the very pipe he was repairing?
Page 65: A Going up there, when he was up there, he tied off to a different pipe. Then when he readjusted his body — his position, I guess he tied off to the pipe that he was working on.
Page 65: Q Did you see where he was — After the fall, when you got to the deck, did you see where he was tied off to? A Yes, sir. Q And it was to the pipe that he was — the damaged pipe? A Yes, sir. Q Okay. Did you have to fill out some type of an incident or an accident report? A Yes, sir.
Page 67: Q I understand. Did you place any fault on anybody?
Page 67: A No.
Page 69: Q That's still your opinion, though; that he tied off to the wrong pipe?
Page 69: Q (By Mr. Mahtook) You can give your opinion. A That's what I was — my understanding of it.
Page 72: A Yes, sir. We talked about it the next day in our safety meeting. And, you know, we just got to watch where we tie off to and, you know, just a general step or general way of not letting it happen again, you know. Just look twice or double check, triple check if you have to. Get another person's opinion, you know.
Page 77: Q I want to go back to something you said earlier that in your experience with working with Mr. Simmons, he cuts corners. I believe those were your words; correct? A Yes, sir.
Page 77: Q Was there a direct request from Mr. Simmons to use scaffolding for the work performed on 70-D on this day, the day of Mr. Padgett's accident, October 10, 2017? A We talked about it — about scaffold. And then the scaffold was gonna be there if we decided to start cutting the pipe open. But being that we weren't gonna cut the pipe open, you know, we agreed that we just gonna go up there and chip, see how far the damages went on that pipe.
Page 77: Q Okay. In order to chip or do any chipping work, is there any reason that Mr. Padgett would have needed come-alongs? A No.
Page 78: Q (By Mr. Taulbee) Okay. When you went down to this cellar deck and looked at the drain pipe, was it obvious that some of the drain had sprung; the connections were no longer intact? A No, sir. We looked at it. And it was no — it was holes. We did see the holes. But as far as it being sprung, nobody knew about that.
Page 79: Q After walking on the cellar deck, the three (3) of
Page 80: y'all returned up and are no longer on the cellar deck, and that's when the JSA is prepared? Am I correct when I say that? A Yes. We — Well I know I'm going to go do a drain line. So I'll make a JSA, you know, for a drain line. If something changes in the JSA, we'll implement it in the JSA.

Page 81: Q During the entirety of the time, would he also have had Mr. Pierre, the welder, and the two (2) riggers with him, if you know? A I believe they were down there. Well I know Jason was down there. Jason Pierre was down there, because he came and got me. He's the one that told me that Richard fell.

Page 82: Q All right; that's fair. I'm going to show you the one (1)

Page email from Mr. Bonin to a representative at Fieldwood; it's subject line, safety meeting. It is Fieldwood Bates stamp 435. I'm going to read just sort of halfway down on

Page 83: that email. And it says — and I'll quote — (quoted as read) During the meeting, the crew mentioned that they felt pressure and feared that they would be, quote, 'run off', end quote, if they were to stop the job for a safety concern. Do you see where he says that? A Uh-huh (yes). Q Is that — MS. MONTE: Yes? Q — what was discussed during the safety meeting with Mr. Bonin at Fluid Crane at the shop? A Yes, sir. What — when — Like I stated earlier, stop work authority — everybody has stop work

Page 83: authority. But also everybody knows the consequences of stop work authority. You use it; sometimes you don't come back.

Page 83: Q Did you — A You know what I mean? So — It's like — I mean, it's not like that everywhere. But, you know, it's happened before. And everybody that works offshore is aware of that. I'm not saying it happened at this particular place or that particular place. But it's just the — how it is out there.

Page 83: Q Had you ever observed Mr. Simmons exert pressure on somebody regarding the use of stop work authority,

Page 84: either before or after this accident? A Yes, sir.

Page 85: Q Was there space under this particular drain line to have scaffolding erected and installed under the drain line, if that would have been the route that people would have chosen to go? A Yes, sir.

Page 85: Q Do you agree with me that if scaffolding would have been used for Mr. Padgett to access this particular

Page 86: drain line on the day of this accident, this accident wouldn't have occurred?

Page 86: A Yes. It could have been, I guess, preventable if scaffold was there.

Page 90: Q (By Mr. Taulbee) Currently, after this accident, are you aware of any procedures or policies that Fieldwood has that requires scaffolding when working over heights over six (6) feet? A Currently, yes. There — we do have to have scaffold that is over — a working flat platform to work on if we're taking down pipe or cutting pipe or anything like that. You know, something secure to — you could have a flat surface to walk or to stand and work on.

Page 91: Q When Mr. Simmons signs off on your JSA's that you

Page 92: prepared, he's signing off as the guy above you approving the JSA; correct? A Yes, sir.

Page 92: Q (By Mr. Taulbee) Likewise — and I forgot who you referred to him as -- Randall Mitchell -- How do you describe Mr. Mitchell? He was the operator, I think you described, on this platform? A Yes, sir. Q Okay. A I believe he was the operator. Q Is he above Mr. Simmons?

Page 92: Q (By Mr. Taulbee) In the chain of command or hierarchy, to your knowledge. A Well operator — they also sign off on the JSA also. You got to have a PIC on the platform. Every platform you go onto, you got to have a PIC.

Page 95: Q (By Mr. Taulbee) And I believe I understand your prior testimony that you can't say one way or the

Page 96: other whether there was scaffolding equipment on the boat that took you to 70-D on the day of this accident; is that correct? A I don't remember there being scaffolding. But I do remember there was

two (2) scaffold builders. But usually whenever we go somewhere, our scaffold builders do have scaffold, you know what I mean. So at that particular day, we were coming from a different job. I don't know. Sometimes we leave our scaffold equipment in different locations. 'Cause there's either no room for the scaffold

Page 96: basket on the boat or no room for the scaffold basket on the complex — on the platform. But if we do need scaffold in those times, we'll go back and get it. We'll bundle it up — bundle it with some straps, instead of bringing the whole basket over. We'll just get what the scaffold builders need.

Page 97: Q And the decision to take or not take scaffolding — is that Mr. Simmons' decision? A Yes, sir.

Page 97: Fieldwood 201. And it's titled Preliminary Information From Fall Incident. And I'm just going to read you part of it and ask you if you agree or disagree. (Quoted as read) The work scope changed — talking about the work on the day of this accident. Is that correct? Yes, the work scope changed.

Page 97: Q All right. It says preliminary findings — crew did not have the necessary equipment, open parenthesis, (scaffolding), close parenthesis, to complete the job safely. Would you agree with that?

Page 98: A Yes, sir.

Page 98: Q — correct? Okay. Let's see. No one recognized that climbing piping and standing on production piping to perform work was hazardous, and there was a safer way to perform the job task. Would you agree with that?

Page 98: A Everybody — we recognized that we needed scaffold. But we weren't gonna do the job that day, so scaffold was eliminated from that day — that particular day. If we were gonna dig into it, yes, we would

Page 99: have had scaffold before we got on there. But just that particular day, that particular time we were there, everybody agreed that we're just gonna assess it through, you know, climbing the racks.

Page 99: Q (By Mr. Taulbee) All right. If there would have been direction from Mr. Simmons to actually start the work that day — in other words, what you and Mr. Padgett and Mr. Simmons talked about ended up being different, and Mr. Padgett was told to get up there and start the work itself, is it fair to say at that point scaffolding should have been required? A Yes, sir.

Page 99: Q (By Mr. Taulbee) It says consultant or PIC did not properly evaluate the elevated work hazards, qualify the level of risk of the job, and establish the required safeguards. Would you agree with that statement?

Page 99: A I mean, they looked. Q (By Mr. Taulbee) Stop work authority was not used by anyone on the crew. Would you agree with that statement? A Yes.

Page 100: Q (By Mr. Taulbee) If Mr. Simmons was down there while Mr. Padgett is climbing up and sees Mr. Padgett do something he's not supposed to do, is it part of Mr. Simmons' right, as the consultant, to tell him to either stop or do it differently?

Page 100: A Yes. Q (By Mr. Taulbee) He an instruct your orkers, even though you're not there as a supervisor. Is that a fair statement? A Yes.

Page 101: Exhibit that Mr. 2

Page 101: Mahtook gave you, which is the JSA for repair/skillet drain line.

Page 101: A Yes, sir.

Page 103: Q They signed after the conclusion of the topics that were discussed in that JSA; right? A This JSA here was made on the way to West Delta 70 Dog.

Page 103: Q Okay. So in any event, even though the scope of work for the Fluid Crane crew may have changed, the job that was to be undertaken at West Delta 70 Dog had been discussed in a JSA before anybody began

Page 104: that work; correct? A Yes, sir. We knew we were going to West Delta 70 Dog to do some repairs on drain lines and cellar deck. Q Okay. A But as far as the extent — Q Right. A — of the repairs, we did not — we were not aware of.

Page 105: Q If there were — I'm sorry; I'm not being clear. If during the inspection of the work area you came across something that you had not anticipated when you did the JSA, and it required a change in the work scope, that would have either been noted on the JSA form or you would have conducted another JSA meeting to address that issue; correct? A Yes, sir.

Page 107: Q Because of that knowledge that you saw, at that time did you think that that section of pipe — the corroded and leaking section of pipe was adequate to serve as a tie off point for a fall protection lanyard? A Me personally? Q Yes. A I wouldn't have done it. But that's — Q I couldn't hear your answer. Could you repeat t.

Page 108: A Me personally, I wouldn't have tied off to the pipe. But that's just — that's me personally, though. I can't speak for somebody else.

**MR. MICHAEL STEPHENS TESTIFIED AS FOLLOWS:**

Page 11: "Q What period of time did you work for Fieldwood? A October 2013, I think that's when the acquisition took place from Apache, and up until March 2018."

Page 14: "A I was just a opreator, a field operator. Q What did you do? What were your responsibilities? A Uh, just main -- you know, maintain production, you know, the field facilities, keep them in compliance."

Page 21: "Q Was there a particular part of a ield or a designation of a field that you were responsible for? A The entire field."

Page 34: "Q I've got a Job Safety Analysis that's identified as Fieldwood 9, 10, and 11, 12, and 13. It has your name on it, I believe. A Typed in? Q Review the document. Does it have your name on it? A Yes, it does."

Page 35: "Q What was the work to be done? A Inspecting platform for hurricane damage."

Page 40: "Q All right. What does it do, what's its function within the field? A It was, uh — it had wells on it, but all the pipelines ran through it."

Page 43: "A I remember they were supposed to go to S and X, 95-S&X, and then we rerouted them to 70-Dog. Typically, the way it was handled, the construction foreman that was sitting in Fieldwood1s office would get with Jason and tell him what to do. Jason and them were on the boat, and — I don't remember how — how — who made the decision, but I remember calling Jason on the radio and telling him that we need to go fix 70-Dog first before going to 95-S&X. It was just me relaying the message. Q What prompted this need to go to West Delta 70-Dog first? A You're asking me why?"

Page 43: "Q Yeah. Why? A Because if West Delta 70-Dog wasn't repaired, then everything else would have to remain shut in, because everything flowed through it. It was an environmental issue. Q What was the environmental issue? A The drain lines."

Page 48: "Q I'm going to ask you to assume Simmons has testified he was told hurry, hurry, hurry, go, go, go, about the work that was to be done."

Page 48: "Q If he said that, did you tell him that? A No, sir."

Page 48: "Q Okay. I ask you to assume that Simmons says you called him and said make real sure you have everything you need before you go to West Delta 70-D. Do you remember telling him that?"
Page 49: "A No, sir."
Page 49: "fair to say that the work that was 11 i s Q"
Page 50: "to be done at West Delta 70-D took priority over all other work that day? A You're asking me if it's fair to say? Q Yeah, is that a fair way to say it, the work for the construction crew on West Delta 70-D took priority over all other work that they were to do? A Hmm, I imagine."
Page 50: "Q And you imagine that because West Delta 70-D had all that production flowing through it? A It was the heart of the field. All — Q So, it's a big deal? A All the pipelines ran through it. Q It was a big deal to get it back up and running? A U h, get it in compliance; I wouldn't say back up and running."
Page 54: "Q Tell me this, if you're sending a guy up"
Page 55: "to work more than six feet above the deck — (Counsel draws diagram) — which is the safer place for him to stand, a round pipe or a flat work surface provided"
Page 55: "by a scaffolding?"
Page 55: "Q Which is safer?"
Page 55: "A Scaffolding is safer."
Page 55: "Q A round pipe is a potentially dangerousplace to have to stand and work because"
Page 56: "A it's round; Yes, sir. 7"
Page 61: "Document 678"
Page 61: "that's been produced. I have a couple of questions. You didn't prepare the Fieldwood investigation document; right?"
Page 61: "A No, sir."
Page 62: "Q "The consultant perceived that the PIC"
Page 63: "wanted him to hurry". Did you ever hear that during the time that you were involved in this set of circumstances?"
Page 63: "A No, sir."
Page 64: "Q What were the rules in place at Fieldwood about tying off to drain lines if you were needing to tie a lanyard for work above six feet? Did they have any that you knew of in this time period? A Just, the anchor point needed to be 5,000 pounds, I think that was the -- I think that's what it stated. Q Okay. And would a drain line be something that would qualify for 5,000 pounds? A I don't know."
Page 65: "Q But if you looked up and you saw a drain line, you wouldn't know whether or not that would be 5,000 pounds capable or not; correct ? A I wouldn't know."
Page 66: "Q Sure. Did the safety rules of Fieldwood require that all work performed on Fieldwood platforms be in compliance with the Safe Work Practices Manual of Fieldwood? A Yes."
Page 67: "the signed by Mr Jason Simmons as It's 15 Do you see that? 16 or Consultant PIC • sir. 17 A Yes , what accident, Okay . On the day o f this 18 Q a s as you knew the situation a s far 19 was o f the drain line was in charge 20 who 21 project as a PIC? A Well, it says, "PIC or Consultant". 22 23 Q Right. 24 A So, Jason was in charge of the job."
Page 71: "Document 244,"
Page 71: "dealing with prejob planning."
Page 71: "Q Does Fieldwood's Safe Work Practices assign responsibility to the consultant to identify hazards and risks of the w o r kplace? A Yes ."

Page 71: "Q Does it assign — assign responsibilities to the consultant to provide information about those hazards to all personnel on the job? A Yes. Q Does it assign the responsibility to the consultant to eliminate, control or minimize hazards in the workplace? A Yes ."
Page 71: "Q That would have been the responsibilities of Mr. Simmons on this drain repair project, as the consultant; correct? A From my understanding."
Page 72: " Document 254"
Page 73: "Q A Q Okay. Did Fieldwood have a Fall Protection portion of the Safe Work Practices Manual? Yes. Did that Fall Protection establish a list of how to address fall hazards for peopleinvolved in fall protection; to do, do? second thing to do, first thing third thing to"
Page 74: "Q Certainly, I can. Does the Safe Work Prawith Fall Protection assiresponsibility to the conconsider methods in whichhazards? A Yes."
Page 74: "Q Does it establish an order; First, Fall Elimination, attempt t o perform Yes , sir. any to eliminate elevated work; the needcorrect? "
Page 74: "The the second first thing to do, one, is Fall if you can'1 t do Prevention. Fall prevention may be accomplished by the useof manlifts, A scaffolds or temporary accessways with standard handrails; correct? Yes . "
Page 80: "Q Thank you. Within the Safe Work Practices rules of Fieldwood, if — if the Fluid Crane crew had asked Mr. Simmons for scaffolding to do this job, the drain repair project; what should he have done? A If the Fluid crew asked him to get scaffolding? Q Yes . A He should have got scaffolding."
Page 81: "Q Is the use of brackets a recognized way to hold up suspended pipe from the ceiling?"
Page 81: "A No -- the support brackets?"
Page 82: "Q A Typically it — they would have support brackets. And a support bracket is intended to keep Q a pipe from falling out of the ceiling and"
Page 82: "h"
Page 82: "hurting somebody; right?"
Page 82: "A It does serve a purpose."
Page 82: "M r . Stephens, if a construction crew, somewent going to do a s this, out and was repair work above six feet , and they had aJ S A, and they decided that they could d o — safely , using using the work harness "
Page 82: "Q"
Page 83: "harnesses and fall protection, you, as a lead operator wouldn't have — would not have any problems with that; correct? A Well, I mean, you know, we were just really — as far as for operations, we -- we assisted construction. So, if they — they felt comfortable doing certain jobs, they did their own thing, unless it was — you know, Operations would step in if it was really unsafe. But, if -- I mean, if they could work off of something and be a hundred percent tied off, well."
Page 83: "Q And I think you testified earlier that the construction crew would have been familiar with Fieldwood's Safe Practice Manual, and they would have been checked off to be able to go offshore because they had been familiar with the Safe Work Manual? A Uh, (witness nods head affirmatively) ."
Page 83: "A That's right ."
Page 87: "Q All right. Now, if you were the Ultimate Work Authority individual, and someone on one of the remoted platforms from Grand Isle 43-AA exercised their stop work authority, what was your responsibility at that time? A Uh, I was the only one that could be the — make the work resume. I'd

have to fly to wherever it took place, and if, uh, if it wasn't safely to do it, well, then we would just not even resume work. We would get everybody else involved, as far as for"

Page 88: "management, to assist us with that. But if we could figure out a way to safely get around it, we would figure out a different route and then we'd resume the work and I'd sign off on it."

Page 90: "Q Right. If Jason Simmons indicated that you may have told him that, would he be correct, or he would be rong? A He would be wrong."

Page 93: "A Well, the only brackets I see is the cable trays. Q Okay. And those provide the support for wiring; correct? A Yes, sir. Q Okay. But nothing for pipe? A I don't see any in any of the photos."

Page 97: "Q If anyone had called stop work authority, what would have happened next? A If they would have pulled stop work, then the PIC, Randall, would have got in touch with me, and then I'd have had to fly over there and, you know, we would have went over everything on why it was pulled, and we would all get together and try to come up with a safer, you know, a safer, uh, safer type, you know, figure out a safer way to complete the job. And if we couldn't, we would have to get management involved, and if you have to get engineering involved, you get engineering involved. And, I mean, you just -- that's how you handle things."

Page 97: "Q Okay. If a contract construction hand is — and I' stepping o n given the choice of attached 2 that was referring to Exhibit choice to -- given the to your deposition step on a pipe using a lanyard for fall"

Page 98: "prevention, but has the option of stopping work and requesting scaffolding to do the job, is that person engaging in the safest course of conduct when they decide to step on the pipe using the lanyard? A Uh, the safest way would have been scaffolding. Q Okay. If they wanted to use the scaffolding? A Right. Or if they wanted to pull stop work, everybody has the option to pull stop work."

Page 100: "Q If you tell -- if you say, "Boss, we think this needs to be done by scaffolding", and the boss doesn't get you scaffolding, is that stop work authority?"

Page 101: "rrWe want scaffolding for this job"? Q it could be a form. A Yeah, it Q Okay. So, Simmons, if"

Page 101: "if that occurred, something like that Q occurred, Mr. Simmons should have called the guy with ultimate work authority and says, "My crew wants stop work -- wants scaffolding, and I disagree"?"

Page 101: "Q If that had happened, Mr. Simmons' would have been to call you; correct? Either call me or get with Randall, he was A the PIC onboard."

Page 102: "Q Okay. A And then Randall would have got with the dispatcher and me and -- Q Gone up the line? A — we would have had the — you know, we would have got the boats to go pick up scaffolding or, you know, I'd have had to fly over there and looked at it with them. Q So, there's no super secret word? You don't have to actually say, "I hereby exercise stop work authority" in order to get that point across; right?"

Page 102: "A Not — not really."

Page 104: "(EXHIBIT NO. 4 MARKED FOR IDENTIFICATION)"

Page 105: "this document is"

Page 105: "for, like we just said, "Sim Ops" Agreement."

Page 105: "Q A Q A What does that mean, don't understand. Multiple jobs -- Okay. — for production "Sim Ops", it's -- and construction. So,they -- this is pretty much just saying that they understand that this is construction's job and they understand this is production's job. "

Page 105: "Q Okay. And does this give ultimate work authority on the platform on that day to Randall Mitchell? A No, sir."

Page 106: "Q Does it designate Mr. Mitchell as the person on the platform, West Delta 70-D, with ultimate work authority on October 10, 2017? A No . Q Can you explain why that's what the do c ume n t says?"
Page 107: "A Well, the document does say that, though. I can't explain it."
Page 109: "Q Sir, A I'm going to refer you to the photograph we were talking about earlier,it is Fieldwood Document 441. look at the pipe runs, for a pipe, If you'll is this a bracket on the suspended pipe (indicating)? Yes, sir. "
Page 110: "(EXHIBIT NO. 6 MARKED FOR IDENTIFICATION)"
Page 110: "Q And that is to resume a job only after stop work authority has been utilized, and whatever the issue is had been resolved; is that correct? A Well, once stop work was erformed, the UWA goes on site and goes through everything, and then he's the only one that can say work can resume."
Page 112: "you looked testified earlier that i f You Q know whether a t a drain pipe you might not pounds; not it could hold 5,000 o r ? A Correct."
Page 112: "Q You would not know what — but if someone was going to attach their fall protection to a drain line, or any piece of equipment, would you expect that person to know whether or not it should hold 5,0 0 0 pounds ? A Yes, sir. Q That's part of the raining in using fall protection; correct? A Correct. Q Knowing where to ttach to? A And identify."
Page 117: "Q Sir, I want to just follow-up on that one question about PIC and construction crew. Was Mr. Simmons, as regards that construction crew, the consultant contract worker, Mr. Simmons, was he the PIC on site for the construction crew?"
Page 117: "A He -- he's -- he's -- I don't -- I don't really know how to answer that question."
Page 117: "Q Okay. A I mean, he's over the construction crew, you know, he's — Q He is higher up the line and over them in authority? A Right.